**AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES, AFL–CIO, Petitioner,**

v.

**FEDERAL LABOR RELATIONS AUTHORITY, Respondent.**

**No. 84–1512.**

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 16, 1985.

Decided Dec. 13, 1985.

As Amended Dec. 18, 1985.

---

William J. Stone, with whom Mark D. Roth, Washington, D.C., was on brief, for petitioner.

William E. Persina, Associate Sol., Federal Labor Relations Authority, with whom Ruth E. Peters, Sol., Steven H. Svartz, Deputy Sol., and Jill A. Griffin, Atty., Federal Labor Relations Authority, Washington, D.C., were on brief, for respondent.

Before WALD, GINSBURG and BORK, Circuit Judges.

Opinion for the Court filed by Circuit Judge WALD.

Dissenting opinion filed by Circuit Judge GINSBURG.

WALD, Circuit Judge.

The American Federation of Government Employees, AFL–CIO (AFGE or Union) seeks review of the Federal Labor Relations Authority's (FLRA or Authority) *Interpretation and Guidance*, 15 F.L.R.A. 564 (1984). In that decision, the FLRA held that the head of an agency has the right under the Federal Service Labor-Management Relations Act (Labor-Management Act), 5 U.S.C. §§ 7101–35, to disapprove of an agreement containing a provision that is contrary to law, rule, or regulation, even if that provision was imposed on the parties by the Federal Service Impasses Panel (FSIP). The FLRA also held that while a union may challenge the head of the agency's action by filing an unfair labor practice charge, or by pursuing an expedited review of the negotiability issue, it may not arbitrate the issue through the negotiated grievance procedure in the contract. Because we find both aspects of the Authority's decision to be reasonable constructions of the Labor-Management Act and its policies, we affirm the Authority's decision.

## I. BACKGROUND

In enacting the Labor-Management Act, Congress sought to provide federal civilian employees with some of the rights enjoyed by employees in the private sector.[1] Spe-

---

1. The Labor-Management Act, enacted in 1978 as Title VII of the Civil Service Reform Act, Pub.L. No. 95–454, 92 Stat. 1111 (1978), was the first statutory scheme dealing with relations between federal employees and management. Prior to its enactment, employer-employee bargaining relationships were governed by a series of Executive Orders. *See, e.g.,* Exec.Order 11491, 34 Fed.Reg. 17605 (1969), *reprinted in* 5 U.S.C. § 7101 pp. 792–97 (1982); Exec.Order No. 10988, 27 Fed.Reg. 551 (1962), *reprinted in* Subcommittee on Postal Personnel and Modernization of the House Committee on Post Office and Civil Service, 96th Cong., 1st Sess., *Legislative*

cifically, Congress found that statutory protection of employees' rights to form labor unions and bargain collectively was in the public interest. 5 U.S.C. § 7101(a)(1). At the same time, Congress recognized that it could not merely transplant private employment statutes to the public employment context. Rather, it would have to "establish procedures which are designed to meet the special requirements and needs of the Government." 5 U.S.C. § 7101(b). Thus, the Act strikes a balance between the need to strengthen employees' bargaining rights, and the need not to unduly interfere with government operations.[2]

Notwithstanding the broad rights the new law conferred on federal employees to engage in collective bargaining, certain subjects were excluded from the scope of bargaining. *See, e.g.,* 5 U.S.C. §§ 7106(a) (management rights); 7117(a)(2) (agency regulation for which "compelling need" exists). To adjudicate "negotiability" disputes arising out of these provisions, Congress set up mechanisms by which a union can appeal an agency's assertion of nonnegotiability. *See, e.g.,* § 7117(c) (expedited review of negotiability issues); § 7118 (unfair labor practice proceedings). Additionally, although strikes continued to be forbidden, § 7116(b)(7), Congress established an Impasses Panel, whose job it is to suggest and if necessary, order terms of settlement between agencies and unions when they cannot agree. § 7119.

In this case, we confront a potential conflict between an agency head's right to assert that a particular provision is not negotiable, and the Impasses Panel's right to impose terms on both parties. This case arose when the Union requested that the FLRA issue a Statement of General Policy on whether the head of an agency has the right to disapprove an agreement because of terms imposed by the Impasses Panel and, if so, whether a union can force the agency to arbitrate the negotiability issue in the parties' negotiated grievance procedure. The FLRA issued an *Interpretation and Guidance* on these issues holding that the head of the agency retains the power to review an agreement's legality even if some terms are imposed by the Impasses Panel, and that arbitration is not an available forum for reviewing the head of the agency's action. The Union now challenges those determinations.

## A. *Negotiability of Issues*

The legislative history of the Labor-Management Act reveals that the scope of a government agency's duty to bargain was one of the most sensitive issues Congress had to resolve.[3] The statute provides that a government agency has a duty to "negotiate in good faith" about "conditions of employment." §§ 7114(a)(4), 7102. But the statute defines "conditions of employment" as excluding matters "relating to the classification of any position" or "specifically provided for by federal statute." § 7103(a)(14)(B)–(C); *see also* § 7117(a)(1) (duty to bargain does not include matters inconsistent with any "Federal law or any government-wide rule or regulation"). The statute further lists a variety of manage-

---

*History of the Federal Service Labor-Management Relations Statute, Title VII of the Civil Service Reform Act of 1978* at 1211 (1979) [hereinafter *Legislative History*]; *see generally Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 91–92, 104 S.Ct. 439, 441–42, 78 L.Ed.2d 195 (1983).

2. Representative Udall, author of the version of the bill that the House sent to conference, explained that Title VII was intended "to meet some of the legitimate concerns of the Federal employee unions as an integral part of what is basically a bill to give management the power to manage and the flexibility that it needs." 124 Cong.Rec. 29,182 (1978), *reprinted in Legislative*

*History* at 923. Similarly, Representative Ford, one of the conferees, described the bill as "a fair package of balanced authority for management, balanced with a fair protection for at least the existing rights the employees have." 124 Cong. Rec. 29,197 (1978), *reprinted in Legislative History* at 951.

3. Much of the dissent to Title VII focused on the extension of the duty to bargain over various issues. *See, e.g.,* H.Rep. No. 1403, 95th Cong., 2d Sess. at 404 (1978), *reprinted in Legislative History* at 730 (dissenting committee members discussing danger of expanding scope of bargaining).

ment prerogatives, some of which the agency may not negotiate, § 7106(a), and some of which the agency may, but is not required to, negotiate, § 7106(b). Moreover, the duty to bargain does not extend to any matters·inconsistent with an agency rule or regulation unless the Authority determines that there is no compelling need for the rule or regulation. § 7117(a)(2).

When, in the course of negotiation, the agency asserts that a union proposal is nonnegotiable, the union has the right to expedited review by the Authority. § 7117(c). After the union [4] files its petition for review, the head of the agency alleging nonnegotiability must file a statement withdrawing the allegation or setting forth the reasons supporting the allegation. § 7117(c)(3)(A). The Authority then must "expedite proceedings ... to the extent practicable and shall issue ... a written decision on the allegation and specific reasons therefor at the earliest practicable date." § 7117(c)(6); *see generally* 5 C.F.R. §§ 2424.1–.10 (1983); H. Robinson, *Negotiability in the Federal Sector* 185–88 (1981).

Even after an agreement is executed between the agency and a union, issues of negotiability may still be raised. First, the head of the agency has 30 days from the time an agreement is signed within which to review the agreement [5] and ensure that it is "in accordance with the provisions of this chapter and any other applicable law, rule, or regulation." § 7114(c)(2). When the head of an agency disapproves an agreement he is making essentially an assertion of nonnegotiability [6] which triggers the expedited review described above. *See National Federation of Federal Employees, Local 1505 and Department of the Interior, National Park Service, Roosevelt-Vanderbilt National Historical Site, Hyde Park, New York,* 7 F.L.R.A. 608 (1982); *American Federation of Government Employees, AFL–CIO, Local 1052 and United States Army Engineer Center, Fort Belvoir, Virginia,* 6 F.L.R.A. 460 (1981). At the end of the 30 days, the agreement automatically takes effect if the head of the agency has not taken action. § 7114(c)(3).

Second even if the parties have never asserted nonnegotiability and have allowed the agreement to take effect, either party

**4.** The statute does not give the agency the right to seek expedited review of a union assertion of nonnegotiability. *See* Decision on Request for General Statement of Policy or Guidance, 16 F.L.R.A. 549, 550 (1984); Veterans Administration Medical Center, Salisbury, North Carolina and American Federation of Government Employees, AFL–CIO, Local 1738, 2 F.L.R.A. 405 (1980). The agency may, however, file unfair labor practice charges to challenge a union's assertion that it need not negotiate about some issue. *See* American Federation of Government Employees, AFL–CIO and U.S. Air Force, Air Force Logistics Command, Wright-Patterson Air Force Base, Ohio, 4 F.L.R.A. 272, 272 n. 1 (1980). There is no legislative history to suggest why Congress did not make the expedited procedure available when the union asserts that an issue is nonnegotiable. A possible explanation is that unions' assertions of nonnegotiability are so rare that Congress thought no special review track was necessary.

**5.** 5 U.S.C. § 7114 provides that
  (c)(1) An agreement between any agency and an exclusive representative shall be subject to approval by the head of the agency.
  (2) The head of the agency shall approve the agreement within 30 days from the date the

agreement is executed if the agreement is in accordance with the provisions of this chapter and any other applicable law, rule, or regulation (unless the agency has granted an exception to the provision).
  (3) If the head of the agency does not approve or disapprove the agreement within the 30-day period, the agreement shall take effect and shall be binding on the agency and the exclusive representative subject to the provisions of this chapter and any other applicable law, rule, or regulation.
  (4) A local agreement subject to a national or other controlling agreement at a higher level shall be approved under the procedures of the controlling agreement or, if none, under regulations prescribed by the agency.

**6.** This case does not necessitate our deciding what types of provisions are subject to disapproval as not "in accordance with the provisions of this chapter and any other applicable law, rule, or regulation." § 7114(c)(2). We express no view, for example, on whether the head of the agency is bound when the agency's negotiators elect to negotiate an issue pursuant to § 7106(b).

may raise illegality of the provision as a defense to a charge that it has violated the terms of the agreement.[7] If the defending party can show that the contract term in question is contrary to law—*i.e.*, was non-negotiable—then the term is declared void and unenforceable. *See National Federation of Federal Employees, Local 1332 and Department of the Army Headquarters, U.S. Army Materiel Development and Readiness Command,* 5 F.L. R.A. 599, 601 (1981).

### B. The Impasses Panel

A second major aspect of the Labor-Management Act was its incorporation of The Federal Service Impasses Panel.[8] The Panel, which is made up of at least seven presidential appointees, is charged with the responsibility of settling bargaining impasses. Either party may request the Panel to conduct an inquiry into a bargaining impasse. If after the Panel makes initial recommendations to the parties they still cannot reach a settlement, "the Panel may —(i) hold hearings; (ii) administer oaths, take the testimony or deposition of any person under oath, and issue subpoenas . . .; and (iii) take whatever action is necessary and not inconsistent with this chapter to resolve the impasse." § 7119(c)(5)(B). *See generally* 5 C.F.R. §§ 2471–.1–.12 (1983). When the Panel imposes a term on the parties it is "binding on such parties during the term of the agreement, unless the parties agree otherwise." § 7119(c)(5)(C).

While the Impasses Panel has considerable power in settling disputes, it does not have the authority to pass judgments on assertions of nonnegotiability. The Act provides that "[t]he Authority shall . . . resolves [sic] issues relating to the duty to bargain in good faith under section 7117(c) of this title." § 7105(a)(2)(E). The Author-

ity has held that § 7105 and § 7117(c), which provides for expedited review of non-negotiability issues by the Authority, preclude the Impasses Panel from considering negotiability issues. *See Interpretation and Guidance,* 11 F.L.R.A. 626 (1983); *see also* House Committee on Post Office and Civil Service, 98th Cong., 2d Sess., *Fifth Annual Report of the Federal Labor Relations Authority* 96–97 (Comm. Print 1984) (panel declines jurisdiction when "threshold questions exist concerning a party's obligation to bargain over a proposal"). Thus, if any time prior to the Impasses Panel's decision, the agency raises a claim of nonnegotiability, the Impasses Panel cannot consider that issue, and the union must seek resolution of the issue before the Authority. *Interpretation and Guidance,* 11 F.L.R.A. at 629.

Decisions of the Impasses Panel are not directly reviewable by the courts. *See Council of Prison Locals v. Brewer,* 735 F.2d 1497 (D.C.Cir.1984). A party's failure to abide by the Impasses Panel's order can, however, be challenged as an unfair labor practice. After the Authority has issued its findings and order in an unfair labor practice proceeding, the parties may seek review in the courts. *See* § 7118(a)(7). Either the Authority or the court may decide that the agency has justifiably refused to comply with an Impasses Panel order because the subject is outside of the statutory scope of bargaining.

### C. The Issues in this Case

On May 25, 1983, the Union, alleging that a number of agencies were using the head of the agency provision in § 7114(c) to disapprove agreements containing terms imposed on the parties by the FSIP, re-

---

**7.** Such a charge might be brought either in an unfair labor practice proceeding, *see* § 7118, or in the parties' negotiated grievance procedure, *see* § 7121. The Authority has yet to clearly decide whether the arbitrator in a negotiated grievance procedure may proceed once it is determined that the issue turns solely on the

legal issues of whether a term is void and unenforceable. We pass no judgment on that question today. *See infra* note 18.

**8.** The FSIP was first introduced in Exec.Order No. 11491, sec. 17, 34 Fed.Reg. 17605 (1969), *reprinted in* 5 U.S.C. § 7101 pp. 792–98 (1982).

quested the Authority to issue a Statement of General Policy,[9] pursuant to 5 C.F.R. § 2427 (1983). The Union claimed (1) that this practice contravenes the statutory mandate that the Impasses Panel's decisons are "binding" on the parties, and (2) that even if the head of an agency has the right to invalidate provisions, a union should be able to arbitrate the issue in the grievance procedure established in the collective bargaining agreement.

The Authority rejected both of the Union's contentions. *Interpretation and Guidance*, 15 F.L.R.A. 564 (1984). It explained that the Labor-Management Act requires that action taken by the Impasses Panel not be inconsistent with the law, and that the head of the agency provision was similarly geared to ensuring that all contracts be in compliance with the law. Thus,

> [r]elying on the plain words of the Statute, and in the absence of relevant legislative history, the Authority conclude[d] that, pursuant to the provisions of section 7114(c), agency heads are empowered to review *all* provisions of collective bargaining agreements, including those mandated by the Panel, to assure conformity with the provisions of the Statute as well as other applicable laws, rules, and regulations.

*Id.* at 567 (emphasis in original). The Authority explained that this interpretation was consistent with the statute's language, since the statute provides for agency head review of collective bargaining agreements, and it "is well established that the procedures of the Panel are part of the collective bargaining process." *Id.* (citing *International Brotherhood of Electrical Workers, AFL–CIO, Local 121 and Department of the Treasury, Bureau of Engraving and Printing, Washington, D.C.*, 10 F.L.R.A. 198, 199 (1982); *American Federation of Government Employees, Locals 225, 1504 and 3723, AFL–CIO v. FLRA*, 712 F.2d 640, 646 n. 24 (D.C.Cir.1983)).

The Authority also held that the Union has two alternative routes to seek review of the head of the agency's determination. *Interpretation and Guidance*, 15 F.L.R.A. at 567. First, the Union may pursue its statutory right of expedited review of negotiability issues, since the head of the agency's disapproval of an agreement is the equivalent of an allegation of nonnegotiability. *Id.* at 567–68 (citing *National Federation of Federal Employees, Local 1505 and Department of the Interior, National Park Service, Roosevelt-Vanderbilt National Historical Site, Hyde Park, New York*, 7 F.L.R.A. 608 (1982); *Association of Civilian Technicians, Inc., Pennsylvania State Council and the Adjutant General, Department of Military Affairs, Commonwealth of Pennsylvania*, 7 F.L.R.A. 346 (1981), *rev'd on other grounds sub nom. Adjutant General, Dep't of Military Affairs v. FLRA*, 685 F.2d 93 (3d

---

**9.** The Union's request for a Statement of General Policy or Guidance was precipitated by events arising out of the Impasses Panel's decision in Department of Justice Bureau of Prisons, Washington, D.C. and Bureau of Prisons Council, American Federation of Government Employees, AFL–CIO, 79 F.S.I.P. 120 (1980) (reprinted as Addendum B to Appellant's Brief). In that case, the FSIP had imposed a term requiring the employer to temporarily stay certain personnel actions. Upon review of the agreement, the head of the agency invalidated the term that the FSIP had imposed, asserting that the issue was nonnegotiable. The Union did not seek review of the head of the agency's action at that time. When the agency later ignored the provision and suspended an employee, that employee used the negotiated grievance procedure to challenge the agency's refusal to abide by the provision that the Impasses Panel had imposed.

Before the arbitrator, the agency argued that there was no arbitrable question since the agency head had negated the provision in question within 30 days of its being signed. Recognizing that the issue of arbitrability turned on whether the head of the agency has the right to negate a provision imposed by the Impasses Panel, the arbitrator refused to decide the issue. Because of the arbitrator's refusal to rule, the Union requested a general Statement of Policy or Guidance from the FLRA.

While these are the facts that gave rise to the request for guidance, it is essential to note that the decision on review here is the *Interpretation and Guidance* in general, not as applied to the particular facts that may have motivated the Union to request it.

Cir.1982)). Alternatively, the Union may file unfair labor practice charges against the agency. *Interpretation and Guidance,* 15 F.L.R.A. at 568. If the Authority finds that the Impasses Panel's provision was not in fact contrary to law, the agency head's disapproval "would constitute a failure or refusal 'to cooperate in ... impasse decisions' in violation of section 7116(a)(1) and (6) of the Statute." *Id.*

## II. DISCUSSION

### A. *Standard of Review*

The Supreme Court recently explained that "[l]ike the National Labor Relations Board ... the FLRA was intended to develop specialized expertise in its field of labor relations and to use that expertise to give content to the principles and goals set forth in the Act." *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983). This court as well, announced in *American Federation of Government Employees, Locals 225, 1504, and 3723, AFL–CIO v. FLRA,* 712 F.2d 640 (D.C.Cir.1983):

> Congress has entrusted to the FLRA primary responsibility for administering and enforcing the Federal Service Labor-Management Relations Act. An FLRA interpretation of the Act, if reasonable and coherent, commands our respect.... As a court of review ... we are not positioned to choose from plausible readings the interpretation we think best. Rather, our task is to inquire whether the FLRA's reading is sufficiently plausible and reasonable to stand as the governing law, absent alteration by Congress.

*Id.* at 643–44; *see also National Treasury Employees Union v. FLRA,* 691 F.2d 553, 558–59 (D.C.Cir.1982) (FLRA construction of statute upheld if it is "reasonably defensible"). Since these decisions in this circuit, the concept of deference to an expert agency's statutory interpretation has been powerfully reinforced by the Supreme Court. *See Chevron, U.S.A., Inc. v. Natu-*

*ral Resources Defense Council, Inc.,* —— U.S. ——, 104 S.Ct. 2778, 2782 n. 11, 2783, 81 L.Ed.2d 694 (1984) (court is not to disturb " 'reasonable accommodation of conflicting policies that were committed to the agency's care by the statute.' ") (quoting *United States v. Shimer,* 367 U.S. 374, 382, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

■ Under *Chevron,* our first task is to determine "whether Congress has directly spoken to the precise question at issue." 104 S.Ct. at 2781. If it has not, "the court does not simply impose its own construction on the statute, as would be necessary in the absence of an administrative interpretation. Rather ... the question is whether the agency's answer is based on a permissible construction of the statute." *Id.* at 2782 (footnote deleted). With this standard in mind, we now turn to the interpretations at issue.

### B. *The Head of the Agency and The Impasses Panel*

The Union argues that the Authority's interpretation of the head of the agency's right to disapprove of an agreement containing terms imposed by the FSIP because of purported nonnegotiability contravenes both the letter and the spirit of the Labor-Management Act. To evaluate this claim we turn first to the language of the statute and then to the policies that it represents.

#### a. *The Statutory Language*

■ The Union's argument that the "binding" provision in § 7119(c)(5)(C) automatically precludes head of the agency review is unpersuasive. It is clear from the structure of the statute that the term "binding" is not absolute. Both sides agree that the Impasses Panel's orders are subject to review first by the Authority in an unfair labor practice proceeding and later by the courts in review of any such proceeding. The terms are only binding in these reviews to the extent that they are within the Panel's statutory authority.[10]

---

10. As the Authority reasoned in its *Interpretation and Guidance,* section 7119(c)(5)(B)(iii) it-

self provides that the Panel may "take whatever action is necessary *and not inconsistent with*

For example, although the Labor-Management Act makes it an unfair labor practice "to fail or refuse to cooperate in impasse procedures and impasse decisions as required by this chapter," § 7116(b)(6), an agency is not guilty of an unfair labor practice if the FLRA or a reviewing court later determines that the issue was nonnegotiable. *See Decision on Request for General Statement of Policy of Guidance,* 16 F.L.R.A. 549, 551 (1984); *State of Nevada National Guard and National Association of Government Employees, Locals R12–130 and R12–145,* 7 F.L.R.A. 245 (1981). The issue posed in this appeal then is not whether the head of the agency must follow the Impasses Panel—the Union concedes that he need not if in fact a provision is ultimately found to be nonnegotiable. Rather the issue is simply whether the head of the agency can trigger immediate review of the negotiability issue through the mechanism of § 7114(c).

When the head of an agency invalidates a typical agreement, his action is treated as the equivalent of an allegation of nonnegotiability under § 7117(c), so as to allow expedited review of the negotiability issue.[11] *See supra* at 853–54. Even if the head of the agency fails to raise the negotiability issue within the 30 day period set out in the statute, he still has the opportunity *not* to comply with a provision and to have its legality determined in the course of an unfair labor practice proceeding. *See American Federation of Government Employees, AFL–CIO, Local 1625 and Fleet Command Training Center, Atlantic, United States Department of the Navy,* 14 F.L.R.A. 162, 162–63 (1984); *American Federation of Government Employees, AFL–CIO, Local 1858 and U.S. Army Missile Command, Redstone Arsenal, Alabama,* 4 F.L.R.A. 361, 362 (1980). Given the fact then that the parties have the opportunity to seek resolution of a

negotiability issue before the Authority at any time in an unfair labor practice proceeding, the term "binding" cannot be dispositive in the statutory scheme.

Moreover, in interpreting § 7119(c)(5)(C), we must take into account the need to reconcile it with the provisions for "head of the agency" review in § 7114(c). Section 7114(c)(1) provides that "[a]n agreement between an agency and an exclusive representative shall be subject to approval by the head of the agency." This court and the Authority have interpreted the term "agreement" as used in the head of the agency provision, to include all terms—whether achieved by negotiation or imposed by the Impasses Panel. *See American Federation of Government Employees, Locals 225, 1504, and 3723, AFL–CIO v. FLRA,* 712 F.2d 640, 646 n. 24 (D.C.Cir. 1983) ("a Panel-imposed settlement, once adopted by the parties, should be regarded as part of a 'collective bargaining agreement' "); *International Brotherhood of Electrical Workers, AFL–CIO, Local 121 and Department of the Treasury, Bureau of Engraving and Printing, Washington, D.C.,* 10 F.L.R.A. 198, 199 (1982) ("it is well established that the impasse resolution procedures of the Panel operate as one aspect of the collective bargaining process").

We conclude, therefore, that the Authority's reconciliation of the two statutory sections for Impasses Panel settlements and head of the agency approval gives adequate meaning to both § 7114 and § 7119. By contrast, the Union's reading of the statute would require that the approval scope of the head of the agency provision be subordinated to the authority of the Impasses Panel to impose settlements. Since neither the clear language nor the legislative history of the statute compels that result, the Authority's interpretation is a reasonable one. *See Chevron, U.S.A.,*

---

*this chapter* to resolve the impasse." (emphasis added).

**11.** Contrary to the dissent's characterization, the head of the agency is not allowed a "unilateral veto over the final, impasse-resolving decision of an impartial and expert panel." Diss.Op. at

863. The only effect of the head of the agency's action is to make his opinion of a term's illegality ripe for immediate review by the Authority, instead of delaying review by the authority until he ignores the provision.

*Inc. v. Natural Resource Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2783, 81 L.Ed.2d 694 (1984).

### b. *Policy of the Act*

The head of the agency provision was fashioned to provide the agency with a final opportunity to review the terms of an agreement that the agency has signed with a union.[12] The provision first appeared in the Senate version [13] of the Civil Service Reform Act, and in a modified form was incorporated into the conference version of the bill. The Senate Committee explained that

> "[t]he purpose of the provision is to ensure that agreements conform to applicable laws (including this subchapter), existing published agency policies and regulations. A substantially identical provision is contained in Executive Order 11491. Experience under that Executive Order in numerous negotiability disputes established that the provision was warranted to accomplish the purpose described, and that the time limit imposed was a reasonable one to expedite the review process without sacrificing the quality of such review."

S.Rep. No. 969, 95th Cong., 2d Sess. 109 (1978), *reprinted in Legislative History* at 769, U.S.Code Cong. & Admin.News 1978, 2723, 2831.

The head of the agency provision was obviously designed to ensure high-level review of executed agreements. Of course, Congress might have limited the head of the agency's opportunity for review to the negotiation phase, but it apparently was unwilling to impose a continuous burden on the head of the agency to review each and every proposal as it arose in the course of day-to-day bargaining. Many of the Union's and the dissent's arguments about the unfairness of the extra 30-day period, apply equally to negotiated agreements and Panel-imposed settlements. We must be cautious not to allow disenchantment with the 30-day review in general, to impact on the independent question of whether Congress intended to except Panel-imposed settlements.

The Union argues that the policy that gave rise to head of the agency review is not applicable when the Impasses Panel has imposed a term, and that the Authority's interpretation is, therefore, unreasonable. The Union has failed to demonstrate, however, why the Impasses Panel's involvement changes anything. Indeed, an argument can be made that Congress's explicit policy to allow the head of an agency to invalidate an agreement may have even stronger justifications for terms imposed by the Impasses Panel, than for those negotiated by the parties. In the latter case, the agency's own authorized representative has agreed to the terms. In the former case, however, no representative of the agency may have agreed to them at all, if the Impasses Panel imposed a settlement which was not suggested by either party.

---

**12.** The Executive Orders had always made provisions for head of the agency review. *See* Exec.Order No. 11491, Sec. 15, *supra* note 1; Exec.Order 10988, Sec. 7, *supra* note 1. The original 1962 Order simply provided that all agreements must be approved by the head of the agency. In the 1972 Order, "[h]owever, in order to prevent 'second-guessing' on substantive issues, the scope of such review was limited to the agreement's conformity with laws, existing published agency policies and regulations, and regulations of appropriate authorities outside the agency." Federal Labor Relations Council, *Summary of Developments to 1977, reprinted in Legislative History* at 1167. In 1974, President Ford amended the Executive Order to provide that the head of the agency must exercise his option within 45 days or else the agreement automatically went into effect. Exec.Order 11838 (1975), 3 C.F.R. § 957 (Comp.1971–75), *reprinted in Legislative History* at 1338.

**13.** The Senate version provided that:

An agreement with a labor organization as the exclusive representative of employees in a unit is subject to the approval of the head of an agency or his designee. An agreement shall be approved within 45 days from the date of its execution if it conforms to this chapter and other applicable laws, existing published agency policies and regulations (unless the agency has granted an exception to a policy or regulation), and regulations of other appropriate authorities.

S. 2640, 95th Cong., 2d Sess. § 7129 (1978), *reprinted in Legislative History* at 591.

Indeed, in such a case, no earlier opportunity for raising the negotiability issue may have been presented. In any event, even if the term was originally proposed by one of the parties, there is no reason why the statutory policy of not entrusting the critical question of compliance with the law exclusively to lower-level officials differs when the Impasses Panel is involved.

AFGE argues nonetheless that in most cases the agency will be familiar with the disputed term before the Impasses Panel imposes it, and so the agency should not be allowed to await the Impasses Panel's decision before it objects. As we have already pointed out, however, the issue here is not *opportunity* to raise the negotiability issue—that is always available as a defense in an unfair labor practice proceeding. The sole question is whether Congress envisioned an intermediate phase of review by the head of the agency within 30 days. The policy behind such a provision would be to permit the head of the agency who usually has the broadest knowledge of agency-wide laws, procedures, rules, and concerns to decide if the term is in fact "in accordance with the provisions of this chap-

ter and any other applicable law, rule, or regulation (unless the agency has granted an exception to the provision)." § 7114(c)(2).

AFGE also argues that the participation of the Impasses Panel is, in and of itself, a sufficient safeguard against illegally imposed terms. This argument misses the mark, however, because the Impasses Panel is not expert in the laws, regulations, practices, and procedures of each governmental agency, and so is not necessarily equipped to decide issues of scope of negotiability.[14] When a negotiability issue is raised in the course of its proceedings, the Impasses Panel automatically loses jurisdiction. *See Interpretation and Guidance,* 11 F.L.R.A. 626 (1983). Thus, the argument that the participation of the FSIP insures against terms that are nonnegotiable fails to persuade.

Our conclusion is bolstered by the Act's general policy of facilitating review of negotiability issues as quickly as possible. Expedited review of the head of the agency's action furthers that policy.[15] If the head of the agency is not allowed to veto a provi-

---

14. Since the Impasses Panel has no jurisdiction to deal with assertions of nonnegotiability, we contest the dissent's assertion that "[n]o doubt Congress also anticipated that the Impasses Panel would be far more experienced and knowledgeable than the agency head when it comes to the consistency of contract terms with the applicable laws." Diss.Op. at 868. Had Congress anticipated that the Panel would be expert in resolving questions of negotiability, it surely would not have precluded it from dealing with disputes whenever the issue of negotiability is asserted.

To demonstrate that head of the agency review is dispensable, the dissent points to the "explicit statutory exception for contracts negotiated at a higher level, as part of a national agreement. *See* 5 U.S.C. § 7114(c)(4) (1982)." Diss.Op. at 867–68. But, as the dissent acknowledges, *that* exception is both "explicit" and "statutory." If the exception is at all probative of the question before us today, it supports the proposition that Congress knew how to exclude certain types of contracts from head of the agency review when it wanted to. Under the doctrine of *expressio unius est exclusio alterius,* Congress's failure to explicitly except Panel-imposed terms from agency review takes on added significance in view of the exception in § 7114(c)(4).

15. The Union expresses concern that the head of the agency may use his 30-day power to delay the implementation of Impasses Panel-imposed terms even when there is no doubt about their legality. Indeed, it argues that in the case that precipitated the Union's request for this interpretation, *see supra* note 9, the FLRA had already held that the provision in question was legal. J.A. at 4 (citing American Federation of Government Employees, AFL–CIO, Local 1999 and Army-Air Force Exchange Service, Dix-McGuire Exchange, Fort Dix, New Jersey, 2 F.L.R.A. No. 77 (1979)). Similarly, the dissent suggest that our decision today "create[s] an opening for abuse on management's side and ... invites ... intransigence, even guile on the part of the agency." Diss.Op. at 867.

This argument seems to assume that the head of the agency stands willing to violate the law whenever it is expedient. Section 7114(c) strictly limits the occasions in which the head of the agency may invalidate an agreement, and there is no basis for asserting that the government will routinely ignore its terms. Any incentive to delay is minimized by the fact that the FLRA may make its decisions in an unfair labor practice proceeding effective retroactively. *See* § 7118(a)(7)(B). Indeed, if the Authority is convinced that the head of the agency was not acting in good faith it has power to fashion

sion within 30 days, then he will be forced to challenge it eventually through non-compliance, by defending against unfair labor practice charges. Ultimately, his is not a choice between compliance and non-compliance with a term he believes illegal. It is a choice between triggering review of the issue within 30 days of the time the contract is signed and triggering review of the issue later, after the agency has refused to go along with the provision in question.

additional sanctions to deter such practices. See § 7118(a)(7)(D) (FLRA may take "such other action as will carry out the purpose of this chapter").

16. The dissent claims that our affirmance of the Authority's interpretation creates a "serious bargaining imbalance", and disrupts the "stable labor relations that the Act was intended to promote." Diss.Op. at 867. But the dissent is unable to demonstrate why the head of the agency review is any more disruptive when the Impasses Panel is involved than when the agreement is a result of negotiation. The only rationale it proffers is that "[t]he agreement that the Panel constructs is intended to be balanced; if the agency can wait and reject a term after the Panel has included it, that balance will be upset." Diss.Op. at 865. The dissent fails to explain, however, why the balance and spirit of compromise are any less delicate when the parties have negotiated an agreement without the Panel's involvement. Yet, notwithstanding the disruption that disapproval might create, head of the agency review is indeed an element in the delicate balance and spirit of compromise that gave rise to Congress's enacting the Labor-Management Act.

Indeed, it would appear that when the head of the agency invalidates an agreement, the whole agreement is invalid—not just the provision that is allegedly illegal. Section 7114(c) speaks of the approval of an agreement—not a single provision. See National Park Service Harpers Ferry, West Virginia, and Bruce Geyman, 15 F.L. R.A. 786, 789 (1984) (invalidated agreement "may not take effect" and "is not binding on the parties"). Thus, the head of the agency's invalidation does not disrupt the balance; it simply delays the whole process. This delay alone is no different than the parties' right to assert nonnegotiability before the Panel's decision, thus removing the Panel's jurisdiction to continue, and delaying resolution of the impasse.

The overwhelming majority of agreements between agencies and unions have "automatic renewal" provisions. See U.S. Office of Personnel Management, Union Recognition in the Federal Government, 101–523 (GPA 1985) (listing all agreements and indicating which have "automatic renewal" provisions). Where these provi-

Essentially the head of the agency provision affects no more than the timing and the forum of review of negotiability issues.[16] As for timing, there is simply nothing in the statute or its policies that supports delayed determination of the issue. As for the forum of review, it is true that a head of the agency determination is not subject to arbitration under the parties' negotiated grievance procedure.[17] See infra Part II.C. But it is also true that

sions are not part of the contract, or are not applicable, the bargaining parties can, and often do, agree to extend their current agreement pending completion of the negotiations. See e.g., Dept. of Health and Human Services Region IX, San Francisco, California and National Treasury Employees Union, 12 F.L.R.A. 183 (1983) (discussing series of temporary extensions). Alternatively, if the Impasses Panel is involved, it presumably could be reconvened subsequent to the head of the agency's action and could order the parties to extend the old agreement, or it could impose a temporary agreement without the newly disputed term. See Federal Service Impasses Panel, A Guide to the Dispute Resolution Procedures Used by the FSIP 3 (1980) ("In a multi-issue case the panel may decide to resolve those issues in dispute about which there are no negotiability problems"). These various alternatives, demonstrate that, while not ideal, delay in reaching a new agreement does not lead to utter chaos.

It is, therefore, evident that all our decision does is to allow the head of the agency an extra 30 days to do that which his subordinates could have done earlier. This is, of course, entirely consistent with the purpose of § 7114(c).

17. The dissent puts great weight on the fact that our decision has the indirect effect of precluding arbitration of the dispute, and, thus, prolonging the process. Diss.Op. at 865–867. This argument is severely flawed on both factual and legal grounds. Factually, the dissent's claim that arbitration can be years shorter than the other forums, explicitly conflicts with the estimates provided by the Union's counsel at oral argument. At that time, counsel asserted that the first phase of arbitration saves "two or three months" over the initial stages of the unfair labor practice route. Moreover, the dissent ignores the fact that even after arbitration, either party may appeal to the FLRA. § 7122. The dissent presents no evidence that after the appeal is taken into account the arbitration process is any quicker than the expedited negotiability appeal or an unfair labor practice proceeding.

Even if there were a larger disparity, however, this would in no way affect our task of

Congress clearly preferred that these issues be taken up directly with the Authority through the expedited review of nonnegotiability assertions. Given the statute's structure and purpose, we conclude that the Authority's interpretation of the relationship between the head of the agency provision and the Impasses Panel provision was reasonable.

In reviewing the FLRA interpretation before us, we again emphasize the constraints of our judicial role. We are not members of Congress, with the power to rewrite the terms of a law which may have revealed infirmities in its implementation. Nor are we members of the FLRA, to whom Congress has delegated the primary authority to fill in interpretative voids in the Labor-Management Act. While we recognize that some of the policy arguments raised by the Union and by our dissenting colleague concerning the dynamics of head of the agency review may indeed present substantial concerns for the participants in the collective bargaining process, we stress that the alternative interpretation they advance creates an equally troublesome host of practical problems, apart from its inconclusiveness as an exercise in statutory interpretation. *See supra* pp. 856-861. Perhaps this fact alone illustrates the wisdom of judicial abstention from redesign of a statutory scheme. Notwithstanding disclaimer, the dissent's main theme is that the Authority's interpretation should be reversed because it is not the *best*, or the *most* reasonable one. We view our task, in contrast, as simply deciding, whether, given the existence of competing considerations that might justify either interpretation, the Authority's interpretation is *clearly contrary to statute* or is an *unreasonable* one. *See Chevron, USA, Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 104 S.Ct. 2778, 2781-83, 81 L.Ed.2d 694 (1984); *supra* pp. 857-858. We think not.

## C. The Availability of Arbitration

■ AFGE also challenges the Authority's holding that the head of the agency's determination of nonnegotiability is not an issue which can be arbitrated as part of the parties' negotiated grievance procedure. While it framed this argument as an alternative one in its brief, at oral argument counsel conceded that if the Authority was correct in deciding that the head of the agency has the right to invalidate the agreement within 30 days, then the negotiated grievance procedure is clearly not the proper forum for resolution. Since we hold today that the Authority was indeed correct in its determination of the first issue,

discerning "which of the two prescriptions, in light of the general *congressional design*, is more appropriately subordinated to the other." Diss.Op. at 863 (emphasis added). That the Authority is currently delayed by a backlog, is hardly a relevant issue in determining whether Congress wanted to give the head of the agency the right to invalidate Panel-imposed settlements. Indeed, even if we were to accept the peculiar notion that we should decide whether there is a right by evaluating the expedience of the remedy, the dissent's approach would require us to engage in periodic reevaluation of our decision to determine whether current statistics relating to delay continue to hold true. Since the dissent considers it relevant that there is currently significant delay, it stands to reason that if the expedited negotiability appeal ever becomes quicker than arbitration, then our view of the "congressional design" must change. The fact is that, as far as Congress was concerned, the expedited appeals procedure was "intended to resolve negotiability disputes speedily, thereby minimizing the interruption of normal collective bargaining." *Nat'l Federation of Federal Employees Local 1167 v. FLRA*, 681 F.2d 886, 889-90 (D.C.Cir.1982). If the reality has changed since then, it is up to Congress—not the courts—to modify the statute.

If indeed the Authority, like this court, has fallen behind in its docket, there are legal and, of course, political techniques of forcing it to speed up the process. *See, e.g., Telecommunications Research and Action Center v. FCC*, 750 F.2d 70, 75-77 (D.C.Cir.1984) (mandamus may lie for unreasonable delay of agency action); *Air Line Pilots Ass'n, Int'l v. CAB*, 750 F.2d 81, 88-89 (D.C.Cir.1984) (court may retain jurisdiction and order periodic progress reports). Suggesting that this delay has an effect on the decision before us today, however, is akin to reasoning that this court should consider its own backlog before deciding whether Congress has invested it with exclusive jurisdiction over a given subject matter.

the second facet of its decision is also correct.

In Part II.B. of this opinion, we concluded that the head of an agency has the right to invalidate an agreement containing terms not in compliance with the law—even those imposed by the Impasses Panel. Once this is recognized, it is clear that the grievance procedure is unavailable to challenge the head of the agency's invalidation of an agreement. The action is treated as an assertion of nonnegotiability and, therefore, must be addressed by the Authority itself. In *Louis A. Johnson Veterans Administration Medical Center, Clarksburg, West Virginia ("Louis A. Johnson")*, 15 F.L.R.A. 347 (1984), the FLRA explained the limits on the arbitrators' statutory authority to decide disputes that involve pure questions of negotiability:

> Clearly, therefore, negotiability disputes which arise between an agency and an exclusive representative under section 7117(c)(1) [claims of nonnegotiability raised before contract takes effect] must be resolved by the Authority as required by section 7105(a)(2)(E). Consequently, such disputes may not be resolved by an arbitrator in the guise of a grievance under the negotiated grievance procedure contained in the collective bargaining agreement between the exclusive representative and the agency.

*Id.* at 349–50 (footnotes deleted).

Contrary to the Union's argument, the determination of the arbitrator's authority to decide issues of negotiability does not turn on an examination of the scope of arbitrators' competence. Rather, the decision in *Louis A. Johnson* was based on the statutory requirement that the Authority settle issues of negotiability itself. *See* 5 U.S.C. § 7105(a)(2)(E) ("The Authority shall ... prescribe criteria and resolve issues relating to the duty to bargain in good faith"); 5 U.S.C. 7117(c) (providing for appeal to Authority); *see generally Interpretation and Guidance*, 11 F.L.R.A. 626 (1983) (Impasses Panel has no jurisdiction to decide issues of negotiability). Given our holding that the head of the agency's action within 30 days triggers the expedited negotiability appeal under § 7117(c), we affirm the FLRA's decision that arbitration is not a proper forum for review of a head of an agency's veto [18] of a term imposed by the Impasses Panel.[19]

## CONCLUSION

The language and the policies of the Labor-Management Act support the FLRA's interpretation that the head of an agency

---

**18.** We pass no judgment on whether the arbitrator can consider the legality of a term if that issue arises *after* the agreement has taken effect, *i.e.,* after the head of the agency's approval of the agreement or the passage of 30 days. The decision in *Louis A. Johnson* was not at all clear on this issue, and we need not address it today.

**19.** The Union also argues that the Authority's decision about the availability of arbitration must be rejected because the FLRA did not provide adequate reasoning on this point in its *Interpretation and Guidance*. We express no view on whether there was adequate explanation for this facet of the decision. Even if the Authority did not adequately set out its reasoning on the issue of whether arbitration is an available track of review, remand for further articulation would be futile since the outcome of that question follows automatically from the Authority's determination that the head of an agency has the right under § 7114(c) to negate a term imposed by the Impasses Panel. *See supra* pp. 861–862. Under these circumstances, the

best course is for the reviewing court to simply apply the obvious result. *See Donovan v. Stafford Constr. Co.,* 732 F.2d 954, 961 (D.C.Cir. 1984) (remand on issue would serve no purpose since "only one conclusion would be supportable"); *International Union, UAW v. NLRB,* 459 F.2d 1329, 1346–47 (D.C.Cir.1972) (declining to remand where "only one rational course to follow"); *People of Illinois v. ICC,* 722 F.2d 1341, 1348–49 (7th Cir.1983) ("*Chenery* does not require futile gestures"); *NLRB v. American Geri-Care, Inc.,* 697 F.2d 56, 64 (2d Cir.1982) (remand would be idle and useless formality "because there is not the slightest doubt that the Board would simply reaffirm its order"); *see generally* Friendly, *Chenery Revisited: Reflections on Reversal and Remand of Administrative Orders,* 1969 Duke L.J. 199, 210–11 (no requirement that "court and agency engage in a nigh endless game of battledore and shuttlecock"); Garland, *Deregulation and Judicial Review,* 98 Harv.L. Rev. 505, 570–71 (1985) (vacating and remanding is not a logical response where there is only one conceivable outcome).

may reject a settlement term imposed by the Impasses Panel because it is violative of management prerogatives under the Act. Its decision was not "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A). Given this decision, it is clear that the Authority was also correct in deciding that arbitration is not the proper forum for what is, essentially, an assertion of nonnegotiability. Therefore, the *Interpretation and Guidance* is

*Affirmed.*

GINSBURG, Circuit Judge, dissenting.

As the majority recognizes, this controversy entails two statutory provisions in tension; the question is which of the two prescriptions, in light of the general congressional design, is more appropriately subordinated to the other. Upon the petitioner-union's request, the Federal Labor Relations Authority (FLRA or Authority) issued the *Interpretation and Guidance* contested in this review proceeding. The challenged Interpretation subordinated a decision of the Federal Service Impasses Panel (Impasses Panel or Panel), which under the statute is "final and binding" on the parties, to the agency head's statutory authority to approve collective bargaining agreements. *See Interpretation and Guidance,* 15 F.L.R.A. 564 (1984). I conclude that the purposes and policies underlying the statute are frustrated by allowing the agency a unilateral veto over the final, impasse-resolving decision of an impartial and expert Panel. I therefore dissent from the court's affirmance of the Authority's Interpretation.

I.

The Federal Service Labor-Management Relations Act, 5 U.S.C. § 7101 *et seq.* (1982) (Act), provides a framework for the negotiation of employment contracts and the resolution of bargaining disputes in the public sector. To facilitate the just and efficient termination of negotiation impasses, the Act created the Federal Service Impasses Panel. The Panel operates as a "mecha-

nism of last resort" in cases where the parties cannot reach agreement. *See Council of Prison Locals v. Brewer,* 735 F.2d 1497, 1501 (D.C.Cir.1984). The members of the Panel are appointed by the President; the statute requires that the appointees be persons "familiar with Government operations and knowledgeable in labor-management relations." 5 U.S.C. § 7119(c)(2) (1982). The Panel's first charge is to assist the parties in accommodating their differences; if inter-party accommodation fails, the Panel is empowered to "take whatever action is necessary and not inconsistent with this chapter to resolve the impasse." *Id.* at § 7119(c)(5)(B)(iii). Panel impasse-resolving action often takes the form of ordering the parties to adopt particular contract provisions. The FLRA and the courts consider such Panel-imposed terms to be part of the collective bargaining agreement. *See International Brotherhood of Electrical Workers, AFL–CIO, Local 121,* 10 F.L.R.A. 198, 199 (1982); *American Federation of Government Employees, AFL–CIO v. FLRA,* 712 F.2d 640, 646 n. 24 (D.C.Cir.1983). The Act mandates that any final action of the Panel "shall be binding on [the] parties during the term of the agreement, unless the parties agree otherwise." 5 U.S.C. § 7119(c)(5)(C) (1982).

The Act also provides, however, that "[a]n agreement between any agency and an exclusive representative shall be subject to approval by the head of the agency." *Id.* at § 7114(c)(1). The agency head has thirty days in which to decide whether or not to approve the agreement, but he must approve it if it is "in accordance with the provisions of this chapter and any other applicable law, rule, or regulation." *Id.* at § 7114(c)(2). The agency head's rejection of a contract term under this provision thus constitutes a claim by him that the term is nonnegotiable. *See Interpretation,* 15 F.L.R.A. at 567. The issue of negotiability may be decided only by the FLRA. *See Interpretation and Guidance,* 11 F.L.R.A. 626 (1983).

The language of the statute creates a tension between the final and binding character of the Panel's decision and the agency head's authority to reject contract provisions that he judges to be contrary to law. The legislative history confirms rather than resolves this tension. Congress clearly desired the Impasses Panel to be the final arbiter in these contract disputes. Indeed, the strength of this desire led Congress to take the unusual step of precluding direct review of Panel decisions by either the FLRA or the courts. *See* H.R.Rep. No. 1403, 95th Cong., 2d Sess. 54 (1978), *reprinted in Legislative History* at 700; *Council of Prison Locals,* 735 F.2d at 1499–1500.[1] On the other hand, it is also clear that Congress wished to maintain the boundaries of management rights as delineated in the Act. *See* maj. op. at 852–853 & n. 3. The agency head's approval authority is designed to secure these boundaries against incursion occasioned by the inexperience or incompetence of the lower level officers who negotiate the contract. The legislative history provides no instruction to the Authority, or the courts, on the appropriate reconciliation of these competing congressional aims.

## II.

When the language and legislative history of a statute are ambiguous, the court generally must defer to the interpretation of the agency entrusted with superintendence of the statutory scheme. *See Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984). But judicial deference cannot be blind or absolute; the courts "must not 'rubber-stamp ... administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute.'" *Bureau of Alcohol, Tobacco and Firearms v. FLRA,* 464 U.S. 89, 97, 104 S.Ct. 439, 444, 78 L.Ed.2d 195 (1983) (quoting *NLRB v. Brown,* 380 U.S. 278, 291–92, 85 S.Ct. 980, 988, 13 L.Ed.2d 839 (1965)); *see American Federation of Government Employees v. FLRA,* 750 F.2d 143, 146 (D.C.Cir.1984). The purpose of the Labor-Management Act was to strike a sensitive balance between the rights of federal employees and the need for effective and efficient operation of the government. *See* 5 U.S.C. § 7101(b) (1982); 123 Cong.Rec. E5566 (daily ed. Sept. 14, 1977) (remarks of Hon. William Clay), *reprinted in Legislative History* at 834. The Authority's holding in this case disrupts that balance and frustrates the policy underlying the statute. It is, therefore, beyond the range of "reasonably defensible" interpretation. *See Department of Defense v. FLRA,* 691 F.2d 553, 558–59 (D.C.Cir.1982).

The Authority's interpretation significantly erodes the right Congress accorded federal employees to bargain collectively. The Act prohibits recourse by federal employees to the ultimate device in labor's cabinet to impel management to reach an acceptable agreement—the strike. *See* 5 U.S.C. § 7116(b)(7) (1982). Having denied federal employees this arm, Congress provided a different mechanism through which a union could force a recalcitrant agency to accept a termination of the dispute. This mechanism is the Federal Service Impasses Panel.[2] The employees' right to bargain

---

1. The FLRA and, eventually, the courts may indirectly review the Panel's decision through an unfair labor practice charge brought against the party refusing to adhere to the Panel-imposed term. If the term is contrary to law then it will not be enforced against the violator. *See* National Federation of Federal Employees, Local 1332, 5 F.L.R.A. 599, 601 (1981). This collateral review provides a safety valve for those few cases in which the Panel imposes an illegal term; it remains clear, however, that Congress permitted no one—not even a court—to nullify a Panel decision by direct action or review.

2. The majority opinion appears to acknowledge the importance of the Impasses Panel as a replacement for the use of economic force. *See* maj. op. at 852 ("[A]lthough strikes continue to be forbidden, Congress established an Impasses Panel, whose job it is to suggest, and if necessary, order, terms of settlement between agencies and unions when they cannot agree.") (citations omitted).

The controlling office of the Panel motivates and provides the entire foundation for the union's challenge to the Authority's Interpretation. The union does not contest the agency head's

would be debilitated if they were denied the secure ability to force negotiations to a conclusion binding on management and simultaneously foreclosed from refusing to work without a contract. Thus, their bargaining capacity depends, to an important extent, on the fairness and efficacy of the impasse resolution procedure.

The Interpretation upheld by the majority opens the way for agency abuse of that impasse resolution process. As counsel for the union pointed out at oral argument, the Panel often functions as a kind of "final offer" arbitrator. *Accord Department of Defense, Army-Air Force Exchange Service v. FLRA*, 659 F.2d 1140, 1146 n. 32 (D.C.Cir.1981). The parties present their proposed contracts and the Panel, rather than designing new terms itself, picks and chooses from among the provisions suggested by the parties to design a contract that is fair as a package. Allowing the agency to withhold an objection to the negotiability of a term until after the Panel issues its decision undermines the fairness of this procedure. The agreement that the Panel constructs is intended to be balanced; if the agency can wait and reject a term after the Panel has included it, that balance will be upset.[3]

For example, in the dispute that led to the Interpretation in this case, the provision that the agency head rejected was one

that *the agency itself* suggested to the Panel. *See Department of Justice, Bureau of Prisons, Washington, D.C.*, No. 79 F.S.I.P. 120 (Oct. 29, 1980) (Factfinder's Report), *reprinted in* Brief for Petitioner, Addendum B at B–51. The Panel might have seen the term as a generous concession—it provided that "[p]ersonnel actions made the subject of formal grievances will be stayed, if the grievant so requests, unless the employer has a good faith reason to go ahead with the actions." *See* Letter from Kenneth T. Blaylock, President of AFGE, to Barbara Mahone, Chairperson of the FLRA, at 2 (May 25, 1983) (requesting an Interpretation and Guidance), *reprinted in* Joint Appendix at 4. In exchange for this term, the Panel might have given the agency a more favorable provision elsewhere in the contract. Allowing the agency head to veto the provision after the Panel has ordered its inclusion permits the agency to misemploy the system by suggesting generous terms and then repudiating them.[4]

A further, intensely practical concern, adds weight to my misgivings about the majority's denigration of the Panel's position in the statutory scheme, and the extra card the majority deals to the agency. The FLRA's disposition, which the court so strenuously labors to affirm,[5] undermines

approval authority as applied to negotiated agreements; rather, the union targets solely and squarely a veto for the agency head over Panel-imposed agreements. The unfairness and the conflict with statutory policy both arise because of the singular and critical role of the Panel's impasse resolution process.

3. The majority attempts to escape this charge of unfairness by expanding the agency head's approval power in a way that presents even greater potential for unfairness. The majority opinion maintains that the agency head's veto has the effect of invalidating not only the allegedly illegal provision, but the entire agreement which contains it. *See* maj. op. at 860 n. 16. In other words, according to the majority, Congress—having set out to create a system which protected federal employees' right to "participate ... in decisions which affect them," 5 U.S.C. § 7101(a)(1) (1982)—gave the agency head the unilateral power to require employees to work under an outdated contract or without any contract at all. As the majority must real-

ize, extending an outdated contract that the employees wish to change may intrude on their self-determination—the self-determination that collective bargaining is designed to implement—well-nigh as much as commanding them to work without any agreement. Thus, under either one of these options, the employees lose the very power that the statute was designed to advance and protect.

4. As the majority points out, the Interpretation was not issued to resolve this particular dispute but to address a broader problem. *See* maj. op. at 854–55 & n. 9. Nonetheless, the facts of this case afford a telling illustration of the kind of abuse the Interpretation countenances.

5. The court's long analysis is scarcely aided by the agency's decision, which answered the union's question, "Is an agency [head] barred from disapproving ... provisions of an agreement ... when such provisions are imposed by decision of the Federal Service Impasses Panel," in a

the employees' rights in this additional and conspicuous way: it delays the decision on the validity of the Panel-imposed term for so long that the term may not be worth anything to the union when it is finally upheld. I agree with the majority that the second issue in this case hinges on the first: if the agency head has the authority to reject a Panel-imposed provision then the union may challenge that action only through an "expedited" negotiability appeal or an unfair labor practice charge. *See* maj. op. at 857, 861–62. Both of these paths lead to the Authority, and the road, as experience reveals, is a long one.

The union estimates that a decision by the Authority may be delayed some three years by the backlog from which that agency suffers. *See* Brief for Petitioner at 15. By contrast, the grievance/arbitration procedure established by every contract, *see* 5 U.S.C. § 7121(a) (1982), may be accomplished in a matter of months. *See* F. Elkouri & E.A. Elkouri, *How Arbitration Works* 9 n. 36, 277 & n. 235 (4th ed. 1985).

This difference may mean a great deal to the union. The term of a public sector labor contract is typically only two or three years, *see* Brief for Petitioner at 16 n. 9; by the time the Authority addresses the issue it might lose its immediate, practical vitality even if the union's appeal could survive a mootness challenge. *See, e.g., FLRA v. Office of Personnel Management,* 778 F.2d 844 (D.C.Cir.1985) (union filed expedited negotiability appeal in February 1980, collective bargaining agreement relevant to union's proposals expired June 1983, FLRA announced its decision February 1984; agency unsuccessfully contended that union's negotiability appeal became moot upon expiration of the particular agreement's term). Moreover, the time lapse itself generates losses that cannot always be compensated by retroactive relief: for example, the loss of procedural protections or beneficial working conditions during the years when the contract should have been in force.[6]

The majority argues that this factual—and therefore changeable—difference in the time required for the various resolution procedures cannot be the basis for an interpretation of congressional intent. *See* maj. op. at 860 n. 17. It is true, of course, that our interpretation of the statutory procedure cannot vary depending on the size of the backlog from which the FLRA suffers; but the slowness of the FLRA's nonnegotiability procedure is nonetheless relevant because it is, in part, symptomatic of the lack of fit between that procedure and the union's concerns.

half-page paragraph noting "the absence of relevant legislative history" and relying simply on "the plain words of the Statute." *See Interpretation and Guidance,* 15 F.L.R.A. at 567. To the extent that there is a reasoned explanation for the Authority's decision, that explanation surely does not come from the mouth of the agency.

**6.** The majority suggests that arbitration is no shorter than a nonnegotiability appeal in the long run because, although the arbitrator's award may be issued sooner, the parties may always appeal that award to the FLRA and thereby cause the final decision to be delayed indefinitely. *See* maj.op. at 860 n. 17. The possibility of appeal fails to vitiate the advantages of arbitration for two reasons. First, only a relatively small percentage of arbitral awards are appealed at all. *See* F. Elkouri & E.A. Elkouri, *supra* at 68 n. 144 (stating that only 17% of arbitral awards were appealed in 1980–1982). Thus, in most cases, the arbitrator's judgment *is* the final decision. Second, even when the arbitrator's award is appealed, existing FLRA regulations require the agency to comply with the award pending the Authority's decision on appeal unless the agency has made a special request for, and been granted, a stay. *See AFGE v. FLRA,* 777 F.2d 751 (D.C.Cir.1985). The FLRA permits stays only under conditions essentially as stringent as those required for the stay of a federal district court order pending appeal. *See id.,* at 758. And in nearly 90% of the cases in which arbitral awards were appealed, the FLRA has ultimately upheld the awards. *See id.* at 758. In other words, if the union is allowed to challenge the agency head's veto through the arbitration procedure, then in most cases it can expect to enjoy the benefits of the arbitrator's award continuously from the date the award issues even if, thereafter, the award is appealed. In contrast, if the union is channeled into the nonnegotiability appeal process, it can expect to wait long years before it sees any benefits even if it is ultimately successful.

The negotiability appeal minimizes the time span between the Panel order imposing agreement terms and the request for review, but places no limit on the amount of time the Authority may take in rendering a final decision. *See* 5 U.S.C. § 7117(c)(6) (1982). From the union's point of view, however, the relevant time period is not the one between the Panel's decision and the request for Authority review; that time may be so brief that scant, if any, loss is sustained. Instead, the lapse critical to the employees' interests is the time between the agency's violation of the agreement and the resolution of the dispute. This latter time, it should be apparent, represents the measure of lost benefits—benefits due under the contract. And it is this crucial period that the availability of arbitration shortens. Thus, the negotiability appeal route requires the union to expend its resources before the issue becomes vital, *i.e.*, when the agency asserts nonnegotiability but is not yet chargeable with breach of contract. Furthermore, no clock limits the time that the union must suffer the adverse consequences of the agency's refusal to follow the Panel-imposed term. Arbitration, on the other hand, is triggered only when the union is positioned to charge the agency with violation of its contractual responsibility. Moreover, the parties have substantial assurances concerning—and sometimes even control over—the time within which a decision will be issued.[7]

Thus, the Interpretation at issue in this case may lead to a substantial delay and severe erosion of the employees' rights. Nor is this erosion of employee bargaining rights counterbalanced by any overriding consideration relating to efficiency or effectiveness in government. Indeed, the Interpretation adopted by the Authority and affirmed by the majority hinders rather than furthers the statutory policy in favor of the smooth operation of government.

The serious bargaining imbalance created by this extension of the agency head's authority undermines both the reality and the appearance of fairness on which the amicable and expeditious resolution of labor disputes depends. By creating an opening for abuse on management's side and an impression of unfairness to the union, the Interpretation invites suspicion and distrust on the part of the union and intransigence, even guile, on the part of the agency. The stable labor relations that the Act was intended to promote will therefore be disserved rather than advanced by this Interpretation.[8]

No discernible government interest supports the bargaining power imbalance that the court affirms today. The purpose served by the agency head's approval authority does not warrant extension of that authority to cover Panel-imposed agreements. That purpose, as the majority points out, was to insure high level review of federal labor agreements. *See* maj. op. at 858. The approval power is designed to prevent the intrusion on management rights that sometimes results from the inexperience or incompetence of the lower level officials who negotiate the contracts. This functional interpretation is confirmed by the explicit statutory exception for contracts negotiated at a higher level, as part

---

7. For example, the American Arbitration Association instructs arbitrators to issue their judgments within 30 days of the close of the hearing and the Federal Mediation and Conciliation Service suggests 60 days after the close of the hearing. *See* F. Elkouri & E.A. Elkouri, *supra* at 277. Moreover, the parties may themselves prescribe time limits on arbitration in their collective bargaining agreements. *See id.*

8. The majority appears to acknowledge "the disruption that disapproval might create," maj.op. at 860 n. 16, and argues only that such disruption is also caused by agency head disapproval of a negotiated agreement. *See id.* But the

balance struck by the statute plainly justifies one kind of disruption while, sensibly comprehended, it rules out the other. The disruption caused by agency head disapproval of a negotiated contract is the price that must be paid in order to protect agency rights from the danger inherent in negotiation by subordinate officials. When an agency head rejects a Panel-imposed contract, however, the disruption is much greater—because of the special role and competence of the impartial, expert Panel as a mechanism of last resort—and there is no countervailing consideration to justify that disruption. *See infra* at 868.

of a national agreement. *See* 5 U.S.C. § 7114(c)(4) (1982). Congress evidently assumed that national officials are experienced and knowledgeable, and therefore found no need for the agency head to review and approve a contract negotiated by such officials.

No doubt Congress also anticipated that the Impasses Panel would be far more experienced and knowledgeable than the agency head when it comes to the consistency of contract terms with the applicable laws. Congress instructed the President to choose Panel members "solely on the basis of fitness to perform the duties and functions involved, from among individuals who are familiar with Government operations and knowledgeable in labor-management relations." 5 U.S.C. § 7119(c)(2) (1982).[9] Panel members obviously are more analogous to the national officers in the statutory exception than to the subordinate negotiators whose deficiencies the agency head's approval power was designed to check.

The majority suggests that the Panel's knowledge may nonetheless be inadequate because the Panel is not aware of all the rules and regulations concerning each agency—rules and regulations with which the agreement must also be consistent. *See id.* at § 7114(c)(2) (head of agency shall approve if agreement is consistent with applicable laws, rules, and regulations). The approval power is functional with respect to Panel-imposed terms, the argument goes, because it allows the agency head to insure that the agreement is compatible with all applicable agency regulations. *See* maj. op. at 859. However, this argument proves too much. The national officers who are exempted from agency

head review, as well as the FLRA and the courts, are surely less familiar with such regulations than the agency head or, indeed, the agency's representatives in negotiations. Rulings by such superior authorities, prescribing or upholding contract terms, are, nonetheless, not subject to subsequent oversight by the agency head. Clearly then, closeness to local regulations is neither sufficient nor necessary for exemption from review by the agency head.

There is a very good reason why this should be so. The Panel, like the Authority and the courts, has the agency as a party before it and, therefore, has easy access to any information it might need regarding potential conflicts between the agreement and agency regulations.[10] The Panel also has the expertise in government operations and labor-management relations that equips it to make the appropriate inquiries before imposing terms. *See supra.* If there is a question of conflict, which raises an attendant issue of negotiability, the Panel's own procedures call for it to decline jurisdiction and allow resolution of the question by the Authority. *See International Brotherhood of Electrical Workers,* 10 F.L.R.A. 198, 198 n. 1 (1982). Thus, the Panel's composition, its procedures, and the administrative process provide ample protection from overreaching Panel decisions without undermining the other purposes of the statute.

The Authority's Interpretation, in sum, is inconsistent with the policies underlying the statutory scheme. It disrupts the delicate balance between labor and management, weakens employees' rights, erodes stable negotiation practices, and serves no significant government interest. It is therefore an unacceptable interpretation.

**9.** These statutorily required qualifications distinguish the Panel members from the members of the Authority, who are required to meet only political criteria. *See* 5 U.S.C. § 7104(a) (1982). The Authority, nonetheless, enjoys an undisputed right to impose terms on an agency free from the threat of agency head disapproval.

**10.** Contrary to the majority's suggestion, constant vigilance by the agency head is not the only alternative to an extension of his revoca-

tion authority to Panel-imposed terms. *See* maj.op. at 858. The agency head's review need be conducted only once, but that review should occur immediately *before* the Panel makes its decision rather than after. Given the Panel's usual practice of adopting some collection of the parties' terms, such an eve of final submission review ordinarily should be sufficient to protect the agency from the imposition of a term it considers nonnegotiable.

### III.

As the majority recognizes, once the question whether the agency head may disapprove a Panel-imposed term is resolved, the issue of where the union may go to challenge the disapproval is essentially answered. *See* maj. op. at 861. If, as I conclude, the agency head had no authority to disapprove the term in the first place, then his rejection of it becomes a simple contract violation. A dispute over the meaning or application of the collective bargaining agreement is properly challenged through the grievance procedure and arbitration. *See Louis A. Johnson Veterans Administration Medical Center, Clarksburg, West Virginia,* 15 F.L.R.A. 347 (1984). In the course of resolving such a dispute, the arbitrator must consider whether the provision at issue violates the applicable laws, rules or regulations. *See id.* at 350–51.[11] Either party may request FLRA review of the arbitrator's decision. *See* 5 U.S.C. § 7122 (1982); *see also supra* note 6.

### IV.

The FLRA's interpretations merit substantial deference when they present reasonable and defensible constructions of the Act. The Interpretation at issue here involves scant reasoning on the FLRA's part, *see supra* note 5, and is incompatible with the policies underlying the statutory scheme. The Federal Service Labor-Management Relations Act, 5 U.S.C. § 7101 *et seq.* (1982), does not authorize an

agency head to undermine the crucial role of the Federal Service Impasses Panel by unilaterally rejecting a term that Panel imposed. The agency's refusal to comply with such a provision is, as I comprehend the legislators' dominant intent, a simple contract violation, subject to the usual grievance and arbitration procedures. I therefore dissent from the majority opinion.

**11.** As counsel for the FLRA acknowledged at oral argument, the issues of illegality and non-negotiability are substantively identical. The question then arises, if only the FLRA may decide the negotiability issue, why may an arbitrator decide the issue of illegality? The *Louis A. Johnson* case suggests that the answer lies not in the substance of the issues but in their context. A negotiability dispute arises when "an agency involved in collective bargaining ... alleges that the duty to bargain in good faith does not extend to any matter." *Louis A. Johnson,* 15 F.L.R.A. at 349 n. 2; *see id.* at 349–50. But disputes relating to the meaning and application of provisions of an existing contract—including disputes over the legality of the provisions—should be decided through arbitration. *See id.* at 350–51. In other words, the Authority has

very sensibly suggested that disputes of this nature which arise in the context of negotiation concern negotiability, and disputes of this nature which arise in the context of enforcing an existing contract concern illegality. *Cf.* National Federation of Federal Employees, Local 1332, 5 F.L.R.A. 599, 601 (1981) (holding that agency head nonnegotiability objections made after 30 days were properly raised in grievance arbitration rather than in a negotiability appeal because the contract had gone into effect). Obviously, if the agency head has no authority to revoke it, then a Panel-imposed agreement is a completed contract when it is issued; any challenge to its terms made in an enforcement proceeding therefore raises an arbitrable issue of illegality.