26 F.3d 1148
 146 L.R.R.M. (BNA) 2705, 307 U.S.App.D.C. 84
 PATENT OFFICE PROFESSIONAL ASSOCIATION, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent.
UNITED STATES DEPARTMENT OF COMMERCE, PATENT AND TRADEMARK
OFFICE, Petitioner,
v.
FEDERAL LABOR RELATIONS AUTHORITY, Respondent.
 Nos. 93-1255, 93-1293.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 17, 1994.
Decided June 28, 1994.
Rehearing and Suggestion for Rehearing
In Banc Denied Sept. 2, 1994.
 
 Joseph V. Kaplan, Washington, DC, argued the cause and filed the briefs, for petitioner Patent Office Professional Ass'n in No. 93-1255.
 Howard S. Scher, Atty., U.S. Dept. of Justice, Washington, DC, argued the cause, for petitioner U.S. Dept. of Commerce, Patent and Trademark Office in No. 93-1293. With him on the briefs were Frank W. Hunger, Asst. Atty. Gen., and William Kanter, Atty., U.S. Dept. of Justice, Washington, DC.
 David M. Smith, Solicitor, Federal Labor Relations Authority, Washington, DC, argued the cause, for respondent. With him on the brief were Arthur A. Horowitz, Associate Solicitor, Richard Zorn and Wendy B. Bader, Attys., Federal Labor Relations Authority, Washington, DC.
 Before: EDWARDS, GINSBURG and HENDERSON, Circuit Judges.
 Opinion for the Court filed by Circuit Judge EDWARDS.
 HARRY T. EDWARDS, Circuit Judge:
 
 
 1
 This case arises from a dispute between the Patent and Trademark Office, Department of Commerce ("PTO" or "Agency"), and the Patent Office Professional Association ("POPA" or "Union") over the negotiability of proposed contract provisions covering employee performance appraisals. At issue here is a decision by the Federal Labor Relations Authority ("Authority") under the Federal Service Labor-Management Relations Statute, 5 U.S.C. Secs. 7101-35 (1988) ("FSLMRS" or "Statute"), upholding the jurisdiction of an interest arbitrator and addressing the negotiability of forty-eight performance appraisal proposals that were awarded by the interest arbitrator.
 
 
 2
 PTO and POPA first submitted their dispute to an interest arbitrator, after having reached an impasse over various proposals, including some that involved the evaluation of employees under a comprehensive performance appraisal plan. The arbitrator resolved many of the outstanding issues, but withheld action on the performance appraisal proposals pending resolution of their negotiability by the Authority. The Authority eventually issued its decision on the negotiability questions, and the bargaining process was set to continue. The Union then submitted a revised package of performance appraisal proposals. Many of the proposals included in the revised package had not been previously presented by the Union to PTO for negotiation. The Agency refused to bargain over most of the new proposals on the grounds that they were either nonnegotiable or untimely. The Union responded by filing an unfair labor practice charge with the Authority, which was dismissed as untimely.
 
 
 3
 Undeterred, the Union submitted the entire package of revised proposals (including both the new proposals and those that already had been on the negotiating table) to the interest arbitrator, who proceeded with a hearing. The Agency refused to participate in the hearing, insisting that the existence of a bargaining impasse was a precondition to the exercise of the arbitrator's authority; on this point, PTO asserted that the arbitrator lacked jurisdiction over the new proposals because the parties had never bargained over those proposals. Over the Agency's objections, the interest arbitrator issued an award that included several of the newly presented proposals. The arbitrator directed that his award be included as "Article 19" of the parties' collective bargaining agreement. PTO's Acting Director for Personnel disapproved Article 19 in its entirety, and the Union, in turn, filed a negotiability appeal with the Authority.
 
 
 4
 The Authority addressed several issues in its decision. First, it rejected the Agency's contention that the interest arbitrator lacked jurisdiction to award Article 19. Second, the Authority expressly declined to consider the Agency's duty-to-bargain objections to the new proposals, stating that those questions would have to be resolved in some other "appropriate proceeding." Last, the Authority addressed the negotiability of each of the Union's forty-eight performance appraisal proposals that had been incorporated into Article 19 by the arbitrator.
 
 
 5
 The Agency now petitions for review, challenging the Authority's ruling that the interest arbitrator had jurisdiction over the new proposals. PTO also contests several of the Authority's negotiability holdings. The Union, in a separate petition for review, contests two of the Authority's negotiability determinations. We first hold that the Authority erred in finding that the interest arbitrator had jurisdiction to award proposals over which the parties never bargained. Neither the interest arbitrator nor the Authority could require the Agency to accept any such proposals as a part of the parties' collective bargaining agreement. As to the Authority's negotiability decisions, we reverse in part and affirm in part.
 
 I. BACKGROUND
 
 6
 PTO and POPA began negotiating a basic collective bargaining agreement in 1981. One subject of negotiation was a performance appraisal plan designed to govern Agency evaluations of employee performance. The parties bargained intermittently over performance appraisal issues until 1985, when the Agency objected that certain proposals presented by the Union were nonnegotiable. The Union responded by petitioning the Authority to review the negotiability of the proposals.
 
 
 7
 In the interim, PTO sought the assistance of the Federal Service Impasses Panel ("Panel") with respect to those issues over which the parties had reached impasse. See 5 U.S.C. Sec. 7119(c)(1) (1988). The Panel is empowered to recommend a course of action, such as mediation, for resolving negotiation disputes. If the parties remain at loggerheads after pursuing the Panel's recommended course of action, the Panel has the authority to "take whatever action is necessary ... to resolve the impasse." Id. Sec. 7119(c)(5)(B)(iii) (1988). This includes imposing disputed contract terms on the parties. See American Fed'n of Gov't Employees v. FLRA, 778 F.2d 850, 857 (D.C.Cir.1985). In this case, the Panel directed the parties to select an interest arbitrator to resolve their disputes.
 
 
 8
 After considering the parties' positions, the interest arbitrator issued an award resolving most of the disputed issues of the basic agreement, but withheld consideration of Article 19, which covered performance appraisals, pending a decision by the Authority on the negotiability of certain proposals contained within the article. Subsequently, in 1987, the Authority issued two decisions that resolved the outstanding negotiability issues, and the parties were poised to resume negotiations over performance appraisal plans.
 
 
 9
 In January 1988, the Union submitted a revised package of performance appraisal proposals to the Agency for negotiation. In addition to proposals that were already on the table, the package included a number of new proposals that the parties had not previously discussed, and which had not precipitated the original 1986 impasse. The Agency informed the Union that it would not bargain over most of the new proposals, because the proposals were either nonnegotiable or untimely. See POPA's July 22, 1988 Letter, reprinted in Joint Appendix ("J.A.") 167; POPA's August 2, 1988 Letter, reprinted in J.A. 170. Specifically, the Agency refused to bargain because, in its opinion, each proposal was either inconsistent with the parties' basic agreement; beyond the scope of the performance appraisal negotiations that had led to the impasse presently before the interest arbitrator; or inconsistent with law, rule, or regulation. The Union responded by filing an unfair labor practice charge with the Authority, alleging that the Agency unlawfully refused to bargain. The Authority, however, dismissed the Union's charge as untimely.
 
 
 10
 In June 1989, the arbitrator directed the parties to commit to writing their respective positions on the performance appraisal proposals. The Agency requested that the newly submitted proposals not be included for consideration. The Union, on the other hand, insisted that the arbitrator consider the entire revised package of proposals. The arbitrator set a hearing to consider Article 19 without making clear which proposals he intended to consider. The Agency refused to participate in the hearing, because the arbitrator declined to address its claim that he lacked jurisdiction over the revised proposals, and because the arbitrator could not consider the Agency's negotiability arguments. The arbitrator issued an award regarding Article 19 on November 30, 1990, and it included several of the proposals over which the parties had never bargained.
 
 
 11
 Following the arbitrator's award, the Agency head disapproved Article 19 pursuant to his authority under 5 U.S.C. Sec. 7114(c)(2) (1988). See Review of Collective Bargaining Agreement, reprinted in J.A. 42a. The Agency head stated that Article 19 in its entirety interfered with management's right to assign work and to direct employees, both management prerogatives that are exempt from bargaining under section 7106(a) of the FSLMRS.
 
 
 12
 Pursuant to section 7117(c)(1), POPA filed a negotiability appeal with the Authority challenging the Agency's disapproval of the article. Before considering the negotiability of the forty-eight proposals that made up Article 19, the Authority made two preliminary rulings. First, it rejected the Agency's argument that the interest arbitrator lacked jurisdiction to award certain proposals. The Authority concluded that the arbitrator possessed the same authority as the Panel to take "whatever action is necessary to resolve an impasse, including ordering the parties to agree to specific proposed language." Decision and Order on Negotiability ("Negotiability Order"), reprinted in J.A. 407 (internal quotation and citation omitted). Second, the Authority expressly limited the scope of its review to the negotiability of the proposals before it, declining to consider the Agency's duty-to-bargain objections. The Authority stated that, "[t]o the extent that such issues exist, they should be resolved in other appropriate proceedings." Id. at J.A. 408 (citations omitted). Having defined the terms of its review, the Authority rendered a negotiability decision on each provision in Article 19. The Agency petitioned this court to review the Authority's jurisdictional ruling and its negotiability determinations with respect to some of the proposals. The Union challenges two of the Authority's negotiability rulings.
 
 II. DISCUSSION
 
 13
 To bring this case into focus, we will divide the proposals under review into two distinct groups. The first group consists of those proposals that are affected by the Agency's challenge to the interest arbitrator's jurisdiction. These are proposals 20, 23, 24, 26 and 42.[1] See POPA's Reply Brief at 3 n. 2 (conceding that these are the proposals affected by the jurisdictional question). The second group consists of those proposals that were on the negotiating table before the Union submitted its revised version of Article 19 to the Agency; this group includes proposals 1, 2, 5, 6, 7, 27, 43, 45 (part 1) and 45 (part 2). Before addressing the negotiability of either group of proposals, however, we first address the Authority's refusal to consider the so-called duty-to-bargain questions raised by PTO, and its holding that the interest arbitrator had jurisdiction to issue an award on proposals that had not been negotiated to impasse.
 
 
 14
 A. The Authority's Refusal to Consider PTO's Duty-to-Bargain Objections
 
 
 15
 This case is fraught with confusion, generated in large measure by the Authority's approach to this dispute below, and compounded by its defense of that approach before this court. In the Authority's negotiability decision, it refused to consider the duty-to-bargain challenges presented by the Agency. See Negotiability Order, J.A. 408. The Authority simply held that the Union was "entitled to a decision on whether a disputed provision is negotiable under the Statute even if additional issues exist, including whether an agency is obligated to bargain over certain proposals made by a union." Id. (citation omitted). Accordingly, the Authority decided that the Agency's duty-to-bargain objections would have to be resolved in "other appropriate proceedings." Id. Neither the parties nor the court have the faintest idea what this decision means. This was highlighted at oral argument, to the consternation of all who listened, when Authority counsel stubbornly defended the Authority's refusal to consider the duty-to-bargain questions by arguing that the Authority's decision was "conditional" and insisting that the Authority did not have to explain what other proceeding would be appropriate. The problem is that neither Authority counsel nor the Authority itself has indicated on what the decision is conditioned. Because the Authority's decision is incomprehensible on these points, each party self-servingly interprets the present state of their bargaining agreement quite differently.
 
 
 16
 The upshot of the Authority's approach is that the Agency and the Union completely disagree over whether the new proposals are presently embodied in the bargaining agreement as ordered by the interest arbitrator. The Agency argues that the Authority's Negotiability Order is conditional in the sense that the Agency need not honor or implement Article 19 until the duty-to-bargain issues are resolved. PTO then goes on to declare that the challenged proposals are now effectively dead because a forum no longer exists to resolve its objections; i.e., an unfair labor practice charge against it for refusing to honor the proposals would be untimely, and it is not subject to a grievance proceeding because the proposals are not part of the contract. Conversely, the Union insists that those proposals that are negotiable are part of Article 19, and that the Agency is bound by their terms and subject to a grievance proceeding if it fails to implement the provisions. Rather than shedding light on what its own decision actually means, the Authority merely repeats that it is not obligated to resolve the issues and that such issues are for some still-unspecified time and place. The Authority's position in this case is utterly irrational and has exacerbated the already contentious nature of the parties' bargaining relationship.
 
 
 17
 Focusing on the combined effect of the Authority's holding that the interest arbitrator had jurisdiction to issue an award on all of the disputed proposals and its refusal to consider the duty-to-bargain issues, illuminates the irrationality of the Authority's approach. By finding that the arbitrator had jurisdiction to impose the entirety of Article 19 on the parties, the Authority must have assumed that the Agency was contractually bound by the terms of the performance appraisal proposals found to be negotiable. See Negotiability Order, J.A. 409 ("Those provisions which we find are negotiable will be included in the parties' agreement."). At the same time, however, the Authority seems to recognize that the Agency may have had no duty to bargain over at least some of the proposals. How can the Agency, on the one hand, be contractually bound by proposals that, on the other hand, were either untimely raised by the Union or not properly before the interest arbitrator because they never had been the subject of negotiations between the parties?
 
 
 18
 If the Authority had simply decided the negotiability issues and declined to decide whether the impasse arbitrator had acted within his jurisdiction, we might be able to make sense of the decision. But the Authority did not so limit its decision, for it held that "[t]hose provisions [found] negotiable will be included in the parties' agreement." Negotiability Order, J.A. 409 (emphasis added). The Agency is now stuck between the proverbial rock and a hard place: having lost before an interest arbitrator with respect to matters not within his jurisdiction and having lost before the Authority in part on the grounds that the arbitrator did have jurisdiction and that the disputed provisions are included in the parties' agreement, the Agency is now left with the Authority's incomprehensible suggestion that, to the extent that issues still exist, they should be resolved in some unidentified "other appropriate proceedings." The Authority's purported resolution of this case is not only inane, it is patently unfair.
 
 B. The Interest Arbitrator's Jurisdiction
 
 19
 Fortunately, the confusion engendered by the Authority's handling of this case is largely dissipated by our conclusion that the interest arbitrator lacked jurisdiction to award the proposals over which PTO claims it has no duty to bargain. This group of proposals consists of numbers 20, 23, 24, 26, and 42. Because these proposals were awarded in the absence of jurisdiction we hold that they are not part of Article 19, regardless of their negotiability which we address below.
 
 
 20
 The interest arbitrator in this case was engaged at the direction of the Panel, and his authority is coterminous with that of the Panel. See Department of Defense Dependents Sch. v. FLRA, 852 F.2d 779, 784 (4th Cir.1988) ("The idea that a 'designee' of the Impasses Panel should have any other or different or even greater authority than that of the panel is ... without authorization."). The Panel--and by delegation, the arbitrator--enjoys the latitude to "take whatever action is necessary and not inconsistent with [the Statute] to resolve the impasse," 5 U.S.C. Sec. 7119(c)(5)(B)(iii), including the power unilaterally to impose contract terms on the parties. The Authority believed that the arbitrator's broad remedial authority empowered him to reach all the disputed proposals.
 
 
 21
 What the Authority totally overlooked was that before the Panel can employ its power, there must first be an impasse. The Statute allows the Panel, and by designation the arbitrator, "to provide assistance in resolving negotiation impasses between agencies and exclusive representatives." Id. Sec. 7119(c)(1) (1988). The Statute does not define a "negotiation impasse," but the Authority's regulations define the term to mean
 
 
 22
 that point ... at which the parties are unable to reach agreement, notwithstanding their efforts to do so by direct negotiations and by the use of mediation or other voluntary arrangements for settlement.
 
 
 23
 5 C.F.R. Sec. 2470.2(e) (1994) (emphasis added). Clearly, the Panel's jurisdiction is premised on the parties being "unable to reach agreement, notwithstanding their efforts to do so." Indeed, the Panel is obligated to "[d]ecline to assert jurisdiction in the event that it finds that no impasse exists." Id. Sec. 2471.6(a)(1).
 
 
 24
 It is indisputable that the parties never bargained over several of the new proposals included in the revised package that the Union submitted to the interest arbitrator. Of these, proposals 20, 23, 24, 26, and 42 became part of Article 19. The Agency had refused to negotiate over these proposals with the Union, asserting duty-to-bargain and negotiability objections. In fact, the Union had filed an unfair labor practice charge against the Agency (which the Authority dismissed as untimely) precisely because PTO had refused to bargain. Clearly, when the interest arbitrator turned his attention to these particular proposals, the parties had never negotiated over them, let alone reached an impasse, and thus the arbitrator had no authority to award these proposals as part of the contract.[2] Therefore, as to proposals 20, 23, 24, 26, and 42, the Authority committed reversible error in ruling that the interest arbitrator had jurisdiction to consider these proposals and in holding that any of the proposals found to be negotiable were part of Article 19 of the parties' agreement.
 
 
 25
 C. The Negotiability of the First Group of Proposals
 
 
 26
 The fact that the arbitrator lacked jurisdiction to award this first group of proposals does not end the matter. The Authority found each of the proposals in this group negotiable, and we summarily affirm its determinations for the reasons given in the Authority's Negotiability Order. While the Agency is not contractually bound by these proposals, it is bound by the negotiability determinations made in this proceeding in any future bargaining rounds, should the Union again present these proposals for bargaining at some appropriate occasion in the future.
 
 
 27
 D. The Negotiability of the Second Group of Proposals
 
 
 28
 Not every proposal that is at issue on review was outside the jurisdiction of the interest arbitrator. Proposals 1, 2, 5, 6, 7, 27, 43, and 45 were properly before the interest arbitrator because the parties negotiated to impasse over each one of these issues.[3] In its decision, the Authority resolved challenges to the negotiability of these proposals after the Agency head disapproved the arbitrator's award. We now review the Authority's negotiability determinations with respect to these proposals, and those we sustain as negotiable will remain part of the parties' agreement.
 
 1. Proposals 1, 2, 5, and 6
 
 29
 Proposals 1, 2, 5, and 6 define the following terms: "performance elements," "performance standards," "rating official," "performance," and "critical element." Each of these terms is already defined by government-wide regulations, promulgated by the Office of Personnel Management ("OPM"). See 5 C.F.R. Secs. 430.203, 432.103 (1993). Relying, in part, on the Union's statement of intent that none of the definitions would be applied in a manner inconsistent with statutory or regulatory provisions, the Authority held that each of the definitional proposals was negotiable. We disagree.
 
 
 30
 The FSLMRS clearly forbids bargaining over government-wide regulations. Section 7117(a)(1) states that "the duty to bargain in good faith shall ... extend to matters which are the subject of any rule or regulation only if the rule or regulation is not a Government-wide rule or regulation." 5 U.S.C. Sec. 7117(a)(1) (1988) (emphasis added). It is irrelevant that the Union claims that its definitional proposals will be consistent with the OPM regulations. Indeed, there can be no assurance of this, because, if the parties disagree over the implementation of any of these proposals in the future, such disputes will be resolved in grievance arbitration; and it is unclear whether the Agency would have any reasonable recourse if an arbitrator construed a provision in a way to make it inconsistent with OPM regulations. The simple point here is that OPM has established government-wide definitions for performance appraisal terms, and the parties are statutorily prohibited from altering those regulations through negotiation. Therefore, we reverse the Authority and hold proposals 1, 2, 5, and 6 are nonnegotiable.
 
 2. Proposal 27
 
 31
 Proposal 27 requires that, in order to be valid, a complaint against a bargaining unit member must be "reduced to writing and the complainant ... identified." Negotiability Order, J.A. 453. The Union argues that the Authority erred when it declared proposal 27 nonnegotiable, because the proposal constitutes a "negotiable procedure" under section 7106(b)(2), or, alternatively, a negotiable "appropriate arrangement" under section 7106(b)(3). The Authority held that proposal 27 was not a "negotiable procedure" or an "appropriate arrangement" because it directly interfered with the Agency's right to discipline its employees--which is a right excluded from bargaining under section 7106(a)(2)(A)--by restricting a type of evidence the agency may use to evaluate an employee's performance. Id. We agree, and reject the Union's arguments on this point.
 
 
 32
 a. A "Negotiable Procedure"
 
 
 33
 While section 7106(a)(2)(A) preserves management's right to discipline its employees, section 7106(b)(2) permits bargaining over "procedures which management officials of the agency will observe in exercising" those rights. 5 U.S.C. Sec. 7106(b)(2) (1988). Caselaw holds that a "procedural" proposal is nonnegotiable if it directly interferes with management's disciplinary rights. See Customs Serv. v. FLRA, 854 F.2d 1414, 1418 (D.C.Cir.1988). The Union insists that proposal 27 itself does not interfere with management's rights, relying on the following dicta in Department of Treasury v. FLRA, 960 F.2d 1068 (D.C.Cir.1992):
 
 
 34
 If the only procedures that qualify under [section 7106(b)(2) ] are those that an agency can violate without fear of a sanction interfering with substantive management rights, then negotiable procedures would seem virtually unenforceable, and paragraph (b)(2) would then lack real content.
 
 
 35
 Id. at 1071. This statement in Department of Treasury is true enough, but it cannot be read to condone proposal 27.
 
 
 36
 The procedure to which the court was referring in Department of Treasury was one that required the agency to provide a written performance evaluation to an employee within forty-five days after an evaluation was prepared. If it failed to do so, the evaluation could not be used and any material it contained that might adversely affect an employee's appraisal or rating would have to be destroyed. Id. at 1070 n. 1. The agency complained that the provision interfered with its right to "direct" employees and to "assign work," because the proposal prohibited management from using evaluative information that is not shared with employees within the stipulated time.
 
 
 37
 Unlike the proposal in Department of Treasury, which imposed a time-frame within which management had to act in order to use a poor evaluation against an employee, proposal 27 does not simply establish a procedural requirement that, if followed, would permit the agency to make full use of its evidence. Rather, proposal 27 effectively eliminates an entire class of evidence--anonymous source evidence--that the Agency can use in disciplining its employees. Such a proposal violates section 7106(a)(2)(A). See American Fed'n of Gov't Employees, Local 1931 v. FLRA, 32 F.L.R.A. 1023, 1047-50 (1988) (finding that a proposal that required statements used or relied upon in adverse actions be in writing and signed by the employee interfered with management's right to make use of many forms of evidence). Thus, the Authority properly recognized that proposal 27 is not merely a procedure for the exercise of managerial rights, but an encroachment on those rights.
 
 
 38
 b. "Appropriate Arrangement"
 
 
 39
 The Union concedes that it failed to argue below that proposal 27 was an "appropriate arrangement," and that such failure normally would bar it from raising the issue on review. See 5 U.S.C. Sec. 7123(c) (1988) ("No objection that has not been urged before the Authority, or its designee, shall be considered by the court...."). It insists, however, that because the Authority ruled sua sponte that the proposal was not such an arrangement, it should be permitted to raise the issue in this court. Under established caselaw, it is clear that because it was not properly raised with the Authority, this issue cannot be considered by the court. See NLRB v. FLRA, 2 F.3d 1190, 1195-96 (D.C.Cir.1993).
 
 3. Proposals 43 and 45
 
 40
 Proposals 43 and 45 deal with the reduction in rank or removal of an Agency employee because of deficient performance. Proposal 43 defines "performance-based disciplinary actions" to include reduction-in-rank decisions. Proposal 45 outlines several "due process" procedures (including a specific period during which an unsatisfactory employee is given the opportunity to improve) that the Agency must follow before taking a performance-based disciplinary action. Further, proposal 45 provides that the minimum improvement required to avoid disciplinary action must be "reasonably attainable." Unsatisfactory employees must be informed of these rights in writing.
 
 
 41
 The Authority found proposal 43 to be consistent with law and thus negotiable. As to proposal 45, the Authority found much of it negotiable. However, the Authority ruled that the Union could not require that the minimum improvement necessary to avoid demotion or discharge be "reasonably attainable," because, in some circumstances, that standard could be something less than "acceptable performance." We hold that each proposal is nonnegotiable in its entirety.
 
 
 42
 Prior to the enactment of the Civil Service Reform Act of 1978, Pub.L. No. 95-454, 92 Stat. 1111 (codified in scattered sections of 5 U.S.C.) ("CSRA"), if an agency wished to remove or demote an employee for poor performance, it had to do so through Chapter 75 of the FSLMRS, which provides the mechanism for taking adverse action against an employee. Under Chapter 75, adverse action can be undertaken, "only for such cause as will promote the efficiency of the service." 5 U.S.C. Sec. 7513(a) (1988). Over time, this standard evolved into a significant obstacle to removing inefficient employees, and Congress became concerned about its effect on the quality of public agencies:
 
 
 43
 The patchwork of statutes, regulations, rules, and judicial restrictions [that had] built up over time had conspired, in effect, to tie the hands of the personnel managers. The "[i]nordinate procedural requirements and unreasonable standards" were condemned [by Congress]. S.REP. No. 969, 95th Cong., 2d Sess. 40 reprinted in 1978 [U.S.C.C.A.N.] 2762. The temptation was to keep an unsatisfactory worker on the payroll rather than go through the protracted hassle of discharging him, with no guarantee that the effort would be successful. This happened too often, and the public suffered.
 
 
 44
 Lisiecki v. Merit Sys. Protection Bd., 769 F.2d 1558, 1561 (Fed.Cir.1985) (reviewing the legislative history of the CSRA), cert. denied, 475 U.S. 1108, 106 S.Ct. 1514, 89 L.Ed.2d 913 (1986).
 
 
 45
 In response to this problem, Congress amended Chapter 43 of Title V (governing the evaluation of public employee work performance) when it enacted the CSRA, and provided a basis independent of Chapter 75 for demoting and removing employees for unsatisfactory performance. See Lovshin v. Department of Navy, 767 F.2d 826, 834 (Fed.Cir.1985), cert. denied, 475 U.S. 1111, 106 S.Ct. 1523, 89 L.Ed.2d 921 (1986). Under Chapter 43, as amended, an employee who is rated "unsatisfactory" may be reduced in grade or removed without being subject to the substantive and procedural requirements of Chapter 75. Additionally, Congress strengthened management's hand by lowering its burden of proof when Chapter 43 actions are appealed to the Merit Systems Protection Board under 5 U.S.C. Sec. 7701(c)(1)(A). Id. ("A Chapter 43 action is ... more narrowly reviewable by the board than a Chapter 75 case in which an agency must establish the facts underlying an adverse action by a preponderance of the evidence.").
 
 
 46
 While acting to empower agencies to deal with unsatisfactory employees, Congress was careful to protect the rights of employees affected by performance-based actions. It provided several "due process" procedures with which an agency must comply before taking action under Chapter 43. See 5 U.S.C. Sec. 4303(b)(1) (1988).[4] Thus, Congress obviously intended to strike a delicate balance between the rights of management to eliminate poor performers and the rights of affected employees to procedural protections.
 
 
 47
 The Union's attempt to add to the procedural side of this equation in this case impermissibly frustrates the "dominant intent of [Congress] ... 'to simplify and expedite procedures for dismissals of Federal employees whose performance is below the acceptable level within a comprehensive framework for performance evaluation.' " Lisiecki, 769 F.2d at 1564 (quoting S.REP. NO. 969, 95th Cong., 2d Sess. 10, reprinted in 1978 U.S.C.C.A.N. 2732). Indeed, proposal 45 would represent a large step back toward the problems inherent in performance-based actions arising under Chapter 75, and would substantially hamper management's ability to deal with unsatisfactory performers within the Agency. This is best illustrated by the proposal's requirement that only "reasonably attainable" performance improvements serve as a basis for performance-based discipline. As the Authority itself found, such a standard would interfere with management's rights by "protecting from discipline those employees who are performing unacceptably if their performance improves to a 'reasonably attainable' level under a performance improvement plan...." Negotiability Order, J.A. 477. Finally, we agree with the Agency that requiring it to provide a written performance improvement plan any time it wishes to demote or dismiss an employee, impermissibly curtails its discretion to discipline employees through either Chapter 75 or Chapter 43. The Agency should be free to take such actions through Chapter 75, which does not require a performance improvement plan, and accept as a consequence the procedural obstacles and heightened burden of proof attendant to actions under that Chapter. For the reasons discussed, we hold that proposals 43 and 45 (in its entirety) are nonnegotiable.
 
 III. CONCLUSION
 
 48
 For the foregoing reasons, we grant PTO's petition for review, reversing in part and affirming in part the Authority's negotiability decision. We reject POPA's petition for review with respect to the issues raised therein.
 
 
 49
 So ordered.
 
 
 
 [1]
 For clarity, we have chosen to refer to the provisions of Article 19 by proposal number, rather than by section number as they are listed in the article. The proposal numbers used here are the same as those used in the Authority's Order
 
 
 [2]
 The Agency's refusal to bargain cannot be construed as an impasse which the arbitrator could rightfully resolve. The Agency's refusal to bargain was premised not merely on a disagreement with the proposals, but on a threshold claim that the proposals were not negotiable. So long as these negotiability issues remained unresolved, coupled with the parties' resulting failure to negotiate over the merits of the proposals, there could be no impasse on the merits. Thus, there was nothing to be considered by the interest arbitrator, for it is well-established that an interest arbitrator cannot resolve negotiability issues. See, e.g., Department of Justice, INS v. FLRA, 995 F.2d 46, 48 (5th Cir.1993); AFGE, 778 F.2d at 854
 
 
 [3]
 The Agency argued in its opening brief that the Authority had wrongly ruled that the second sentence of proposal 7, which limits the designation of a performance element to "those aspects of work over which the employee has control," was negotiable. In fact, the Authority held that the second sentence of proposal 7 was nonnegotiable. In its reply brief, the Agency concedes that there is no controversy with respect to proposal 7, PTO's Reply Brief at 9, thus we will not review the Authority's negotiability determination with respect to this proposal
 
 
 [4]
 Section 4303(b)(1) provides in full:
 An employee whose reduction in grade or removal is proposed under this section is entitled to--
 (A) 30 days' advance written notice of the proposed action which identifies--
 (i) specific instances of unacceptable performance by the employee on which the proposed action is based; and
 (ii) the critical elements of the employee's position involved in each instance of unacceptable performance;
 (B) be represented by an attorney or other representative;
 (C) a reasonable time to answer orally and in writing; and
 (D) a written decision which--
 (i) in the case of a reduction in grade or removal under this section, specifies the instances of unacceptable performance by the employee on which the reduction in grade or removal is based, and
 (ii) unless proposed by the head of the agency, has been concurred in by an employee who is in a higher position than the employee who proposed the action.