# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 7, 2013              Decided January 3, 2014

No. 12-1456

UNITED STATES DEPARTMENT OF THE TREASURY
INTERNAL REVENUE SERVICE
OFFICE OF CHIEF COUNSEL WASHINGTON D.C.,
PETITIONER

v.

FEDERAL LABOR RELATIONS AUTHORITY,
RESPONDENT

NATIONAL TREASURY EMPLOYEES UNION,
INTERVENOR

———

Consolidated with 13-1066

———

On Petition for Review and Cross-Application for
Enforcement of a Final Decision of the Federal Labor
Relations Authority

———

*Howard S. Scher*, Attorney, U.S. Department of Justice, argued the cause for petitioner. With him on the briefs were

*Stuart F. Delery*, Principal Assistant Deputy Attorney General, and *Leonard Schaitman*, Attorney.

*Zachary R. Henige*, Attorney, Federal Labor Relations Authority, argued the cause for respondent. On the brief was *Rosa M. Koppel*, Solicitor. *David Shewchuk*, Deputy Solicitor, Federal Labor Relations Authority, entered an appearance.

*Peyton H. N. Lawrimore* argued the cause for intervenor National Treasury Employees Union. With her on the brief were *Gregory O'Duden* and *Larry J. Adkins*.

*Matthew W. Milledge*, *David A. Borer*, and *Andres M. Grajales* were on the brief for *amicus curiae* American Federation of Government Employees, AFL-CIO in support of respondent.

Before: TATEL and KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* TATEL.

TATEL, *Circuit Judge*: Section 7106(b)(3) of the Federal Service Labor Management Relations Statute (FSLMRS), 5 U.S.C. § 7101 *et seq.*, provides that collective bargaining agreements reached between federal agencies and their employees' bargaining representatives may contain provisions that, although interfering with certain managerial prerogatives, constitute "appropriate arrangements for employees adversely affected by the exercise" of such management rights. 5 U.S.C. § 7106(b)(3). In determining whether a given "arrangement[]" is "appropriate," the Federal Labor Relations Authority ("the Authority")—which is charged with administering the FSLMRS—has, depending on how the issue comes before it, applied two different

substantive tests that might yield different results for the very same arrangement. As explained in this opinion, by adopting two inconsistent interpretations of the same statutory language, the Authority has acted arbitrarily and capriciously.

**I.**

The FSLMRS establishes the framework governing labor-management relations in the federal government. The statute requires federal agencies and labor organizations representing their employees to "meet and negotiate in good faith for the purposes of arriving at a collective bargaining agreement," 5 U.S.C. § 7114(a)(4), and sets forth various requirements for both the bargaining process and the content of any agreement.

At issue here is section 7106 of the Act. Section 7106(a) provides: "Subject to subsection (b) of this section, nothing in [the FSLMRS] shall affect the authority of any management official of any agency" to exercise certain management rights, which include the authority to "hire, assign, direct, layoff, and retain employees in the agency, or to suspend, remove, reduce in grade or pay, or take other disciplinary action against such employees," *id.* § 7106(a)(2)(A), and "to assign work, to make determinations with respect to contracting out, and to determine the personnel by which agency operations shall be conducted," *id.* § 7106(a)(2)(B). Section 7106(b), in turn, provides in relevant part that "[n]othing in this section shall preclude any agency and any labor organization from negotiating," among other things, "appropriate arrangements for employees adversely affected by the exercise of any authority under this section by such management officials." *Id.* § 7106(b), (b)(3).

We addressed the interaction between sections 7106(a) and 7106(b)(3) in *American Federation of Government*

*Employees, Local 2782 v. FLRA*, 702 F.2d 1183 (D.C. Cir. 1983) ("*AFGE I*"). There the Authority had held that any "arrangement" that interferes with the management rights set forth in section 7106(a) was necessarily not "appropriate" within the meaning of section 7106(b)(3). *See id.* at 1185–86. Rejecting this reading, we explained that section 7106(b)(3) establishes "an *exception* to the otherwise governing management prerogative requirements of subsection (a)." *Id.* at 1187. Thus, the provision contemplates that the management rights set forth in section 7106(a) will give way, to some extent, to "appropriate arrangements" for adversely affected employees. *See id.* Finding that an arrangement is inappropriate simply because it interferes with the enumerated management rights would, we concluded, render the section 7106(b)(3) exception entirely meaningless. *See id.* at 1188. We observed, however, that "some arrangements may be inappropriate because they impinge upon management prerogatives *to an excessive degree*," and we declined to "speculate as to what the word 'appropriate' may lawfully be interpreted to exclude." *Id.*

Significantly for the issue before us, questions regarding section 7106's application may come before the Authority in at least three ways. First, an agency may assert during collective bargaining that a particular union proposal falls outside the agency's duty to bargain because it would contravene section 7106. Agencies are not required to bargain over all issues relating to conditions of employment, but may instead declare a particular union proposal to be "nonnegotiable" if, for example, the proposal would be "inconsistent with any 'Federal law or any government-wide rule or regulation.'" *American Federation of Government Employees v. FLRA*, 778 F.2d 850, 852 (D.C. Cir. 1985) ("*AFGE II*") (quoting 5 U.S.C. § 7117(a)(1)). The union may seek expedited review of such nonnegotiability

determinations before the Authority. *See* 5 U.S.C. § 7117(c). Second, any agreement ultimately reached between the agency's bargaining representatives and the union is "subject to approval by the head of the agency," *id.* § 7114(c)(1), with such approval required "if the agreement is in accordance with the provisions of [the FSLMRS] and any other applicable law, rule, or regulation," *id.* § 7114(c)(2). An agency head may reject a provision on the ground that it contravenes section 7106, a decision the union may then appeal to the Authority. *See id.* § 7105(a)(2)(E). Third, an agency might take exception to a provision imposed in arbitration, asserting before the Authority that the arbiter's award violates section 7106. *See id.* § 7122(a)(1).

In a series of decisions, the Authority has delineated the substantive tests it will use in each of these three sorts of appeals to determine what constitutes a section 7106(b)(3) "appropriate arrangement[]." Following our decision in *AFGE I*, the Authority first addressed the issue in *National Ass'n of Government Employees, Local R14-87*, 21 F.L.R.A. 24 (1986) ("*KANG*"), a case that arose in the context of an agency head's determination under section 7114(c) that a collective bargaining provision was impermissible. *See id.* at 24. The Authority adopted what it characterized as the "excessive interference test enunciated" in *AFGE I*, holding:

> In this and future cases where the Authority addresses a management allegation that a union proposal of appropriate arrangements is nonnegotiable because it conflicts with management rights . . . , the Authority will consider whether such an arrangement is appropriate for negotiation within the meaning of section 7106(b)(3) or[] whether it is inappropriate because it excessively interferes with the exercise of management's rights.

*Id.* at 30–31. The Authority went on to describe the factors it would consider in evaluating whether a given arrangement "excessively interferes," among them whether the "negative impact on management's rights [is] disproportionate to the benefits to be derived from the proposed arrangement." *Id.* at 31–33.

Soon thereafter, the Authority applied the same "excessive interference" test in a case that arose in the context of a union's appeal from an agency declaration during collective bargaining that a particular proposal was nonnegotiable. *See American Federation of Government Employees, Local 1923*, 21 F.L.R.A. 178, 186 & n.2 (1986) ("*Local 1923*").

But the Authority has treated somewhat differently agency claims that a provision in an arbitrator's award impermissibly interferes with management rights and should be set aside as "contrary to . . . law" pursuant to section 7122(a)(1). Although initially applying the "excessive interference" test in such cases, *see Washington Plate Printers Union Local No. 2*, 31 F.L.R.A. 1250, 1256 (1988), the Authority later changed course, holding that only when an award "abrogates" a management right—which occurs when the award "precludes an agency from exercising" the right— would the Authority grant the agency relief, *Department of the Treasury, U.S. Customs Service*, 37 F.L.R.A. 309, 314 (1990). After some further oscillation, *see Department of Justice, Federal Bureau of Prisons*, 58 F.L.R.A. 109, 110 (2002) (returning to the "excessive interference" test), the Authority eventually settled on this "abrogation" standard, *see U.S. EPA*, 65 F.L.R.A. 113, 116–17 (2010) ("*EPA*").

Then, overruling its prior decision in *KANG*, the Authority extended this "abrogation" test to appeals brought when an agency head disapproves a provision under section 7114(c). *See National Treasury Employees Union*, 65 F.L.R.A. 509, 512 (2011) ("*NTEU I*"). The Authority made clear, however, that it would continue to apply the "excessive interference" standard when, during bargaining, an agency asserts that a proposal is nonnegotiable. *Id.* at 512 n.4. Member Beck dissented, contending, among other things, that the Authority had no basis for holding that "the same proposal that is legally invalid if it 'excessively interferes' with management rights at the bargaining table magically becomes valid and binding when it lands on the agency head's desk." *Id.* at 519 (Beck, M., dissenting). The Department of the Treasury, petitioner here, sought review, but we dismissed the case for lack of jurisdiction because Treasury had failed to properly present its arguments to the Authority. *See Department of the Treasury v. FLRA*, 670 F.3d 1315, 1316 (D.C. Cir. 2012).

This case arose after the IRS Office of Chief Counsel—a component of Treasury—and the National Treasury Employees Union renegotiated their collective bargaining agreement. Reviewing the agreement pursuant to section 7114(c), the agency head found eight provisions contrary to law. The only provision still at issue here governs sick leave. The agency head contended that this provision—whose details are unimportant to the issue before us—impermissibly interfered with management's right to discipline employees. *See* 5 U.S.C. § 7106(a)(2)(A).

On appeal, the Authority found in favor of the union, ordering Treasury to rescind its disapproval of the sick leave provision. *National Treasury Employees Union*, 66 F.L.R.A. 809, 813 (2012) ("*NTEU II*"). The Authority agreed with the

agency that the provision affected the management right to discipline secured by section 7106(a). *Id.* at 812. But applying its newly-adopted "abrogation" standard—and rejecting Treasury's argument that it should return to the "excessive-interference" standard, *id.* at 812 n.8—the Authority concluded that the provision was an "appropriate arrangement under § 7106(b)(3)," *id.* at 813. It reasoned that the "provision merely limits the circumstances in which management may exercise its right to discipline; it does not preclude the Agency from exercising that right." *Id.* at 812. It rebuffed Treasury's reliance on two prior Authority decisions, *National Federation of Federal Employees, Local 858*, 42 F.L.R.A. 1169 (1991), and *American Federation of Government Employees, Local 1156*, 42 F.L.R.A. 1157 (1991), which had found that similar sick leave provisions were not "appropriate arrangements," explaining that in those cases it had "applied an excessive-interference standard, rather than an abrogation standard." *NTEU II*, 66 F.L.R.A. at 812. Member Beck again dissented for the reasons given in his *NTEU I* dissent. *Id.* at 815–16 (Beck, M., dissenting).

## II.

Treasury now petitions for review, contending that the Authority's decision to continue applying two different legal standards in assessing whether a section 7106(b)(3) "arrangement[]" is "appropriate" is arbitrary and capricious within the meaning of the Administrative Procedure Act. *See* 5 U.S.C. § 706(2)(A) (an agency decision may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"); *see also id.* § 7123(c) (adopting section 706's arbitrary and capricious standard for judicial review of FLRA decisions). Although we generally defer to the Authority's reading of the FSLMRS, *see Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842–43 (1984), under the arbitrary and capricious

standard, we may affirm the Authority's interpretation and application of its governing statute only if it has "provide[d] a rational explanation for its decision." *Ass'n of Civilian Technicians, Puerto Rico Army Chapter v. FLRA*, 370 F.3d 1214, 1220 (D.C. Cir. 2004) (internal quotation marks omitted). Here, the Authority has failed to satisfy that obligation.

In deciding to apply an "abrogation" standard in some circumstances and an "excessive interference" standard in others, the Authority invoked nothing in section 7106(b)(3)'s text. Instead, it concluded that using these different standards was justified by the distinction between, on the one hand, the text of the statutory provisions governing agency-head review of collective bargaining agreements and agency challenges to arbitration awards, and, on the other hand, the text of the provision governing an agency's power to declare a union proposal nonnegotiable during collective bargaining. *See NTEU I*, 65 F.L.R.A. at 512–13. Specifically, both section 7114(c)(2), governing agency-head review, and section 7122(a)(1), governing exceptions to arbitration awards, are phrased in terms of a provision's consistency with law. *See* 5 U.S.C. § 7114(c)(2) (agency head "shall approve" agreement reached by collective bargaining representatives if "the agreement is in accordance with the provisions of [the FSLMRS] and any other applicable law, rule, or regulation"); *id.* § 7122(a)(1) (FLRA may set aside arbitration award if it is "contrary to any law, rule, or regulation"). By contrast, section 7117(c), which governs an agency's authority to refuse to bargain over a proposed provision, speaks in terms of the agency's "duty to bargain," not the provision's legality. The language of these subsections, the Authority reasoned, demonstrates that "the mere fact that a proposal is outside the duty to bargain does not mean that it is contrary to law, rule, or regulation." *NTEU I*, 65 F.L.R.A. at 512. That distinction,

the Authority continued, in turn justifies applying two different standards when evaluating whether an arrangement qualifies as "appropriate" under 7106(b)(3). *See id.* at 512–13.

It is true, as the Authority asserts, that certain provisions that fall outside the duty to bargain would not, if agreed to, be contrary to law. The Authority generally designates such matters as "permissive" subjects of bargaining. *See NTEU I*, 65 F.L.R.A. at 512; *EPA*, 65 F.L.R.A. at 119 n.12. Thus, for example, an agency has no obligation to bargain over proposals relating to the conditions of supervisors' employment because the duty to bargain extends only to bargaining unit employees' conditions of employment, and supervisors are outside the bargaining unit. *See International Ass'n of Fire Fighters Local F-61*, 3 F.L.R.A. 437, 444–45 (1980). But because nothing in the statute prohibits the agency from negotiating over such matters, the Authority has held that an agency nonetheless may engage in collective bargaining regarding the conditions of supervisory employment if it so chooses. *See American Federation of Government Employees Local 3302*, 52 F.L.R.A. 677, 681–82 (1996); *but see U.S. Department of Navy v. FLRA*, 952 F.2d 1434, 1441 (D.C. Cir. 1992) (suggesting that permitting the "union to seek to regulate, through collective bargaining, the conditions of employment of employees in other bargaining units and management personnel (who are excluded by the FSLMRS from membership in any bargaining unit) . . . is flatly at odds with both the FSLMRS and the [National Labor Relations Act]"). Likewise, section 7106(b)(1) expressly identifies certain matters that, although interfering with section 7106(a) management rights, may nonetheless be negotiated "at the election of the agency." 5 U.S.C. § 7106(b)(1). Accordingly, an agency's bargaining representatives could elect to negotiate over and agree to a proposal regarding matters set forth in section 7106(b)(1) that,

while outside the duty to bargain, would nonetheless be consistent with federal law.

But the foregoing is beside the point because the distinction between mandatory and permissive subjects of bargaining has nothing to do with section 7106(b)(3). That is, a proposed section 7106(b)(3) arrangement that falls outside the agency's duty to bargain does so precisely *because* it is contrary to law, as the Authority appeared to acknowledge when it first adopted the "excessive interference" test. *See Local 1923*, 21 F.L.R.A. at 186–88; *KANG*, 21 F.L.R.A. at 29–30. Thus, any time the agency's bargaining representatives could properly refuse to negotiate over a proposal because it does not qualify as a section 7106(b)(3) "appropriate arrangement[]," that proposal will be contrary to law and rejectable by the agency head for precisely the same reason.

That this is so follows directly from section 7106's text and structure. Section 7106(a) establishes certain management rights, and provides that nothing in the FSLMRS will affect those rights. Section 7106(b)(3) sets forth an exception to section 7106(a)'s mandate, so that, if a proposal constitutes a section 7106(b)(3) "appropriate arrangement[]," it does not violate section 7106(a) and is thus consistent with federal law. *See AFGE I*, 702 F.2d at 1187. The agency then *must* negotiate over such a proposal. *See National Ass'n of Government Employees, Local R14-87*, 21 F.L.R.A. 313, 317–18 (1986). If, however, the arrangement is inappropriate, the section 7106(b)(3) exception is inapplicable, and, unless another exception applies, the proposal violates section 7106(a) and is thus both contrary to law and outside the agency's duty to bargain. As the Authority explained in *NLRB Union Local 21*, 36 F.L.R.A. 853 (1990), in rejecting the

argument that an agency had waived its claim that a provision violated section 7106(a):

> [T]he proposal concerns the exercise of management's right under section 7106(a)(1) of the Statute, rather than under section 7106(b)(1). Therefore, the issues of "election" and "waiver" that would be involved if the proposal concerned a permissive matter under section 7106(b)(1) do not arise. A reserved management right under section 7106(a)(1) cannot be waived by collective bargaining.

*Id.* at 860. The same reasoning applies here. Unlike section 7106(b)(1), section 7106(b)(3) is all or nothing—it gives the agency no discretion to "elect" to address certain subjects during collective bargaining. Instead, it draws a line between what is and is not permissible under section 7106(a), and thus what is and is not consistent with law.

Neither in its decisions adopting the abrogation standard nor in its briefing before this court does the Authority address this basic point. In *NTEU I*, after discussing at some length the fairly noncontroversial proposition that some subjects outside the duty to bargain might nonetheless be consistent with law, the Authority relied on its prior decision in *EPA* for the key proposition that this distinction was somehow relevant to section 7106(b)(3) specifically. *See NTEU I*, 65 F.L.R.A. at 512–13. The *EPA* decision simply summarized the two examples of permissive subjects of bargaining discussed above, then stated: "No basis is provided to conclude that the situation is any different when management rights under § 7106(a) are involved." *EPA*, 65 F.L.R.A. at 118. The "basis" for such a difference, however, is clear: unlike section 7106(b)(1), or the provisions governing conditions of

supervisory employment, sections 7106(a) and 7106(b)(3) leave no room for agency representatives to reach agreements on terms outside the scope of the duty to bargain but within the range of lawful provisions.

Here, for the first time the Authority addresses section 7106(b)(3)'s language, arguing that what is "appropriate" may "vary[] depending on the circumstances." Respondent's Br. 27. But the "circumstances" relevant to determining whether an arrangement is "appropriate" within the meaning of section 7106(b)(3) are those governing how, in a particular agency, the arrangement will affect the exercise of the management rights listed in section 7106(a), not how the issue comes before the Authority. The Authority's current interpretation of the statute could, as it concedes, mean that the propriety of two identical provisions, each affecting the exercise of management rights in precisely the same way, would rise or fall on the point at which the agency asserts the arrangement is inappropriate. Section 7106(b)(3) provides no basis for this sort of "magical[]" transformation, as Member Beck put it. *NTEU I*, 65 F.L.R.A. at 519 (Beck, M., dissenting). If it is a "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," *Commissioner v. Lundy*, 516 U.S. 235, 250 (1996) (internal quotation marks omitted), then a word that Congress uses only *once* in a statute certainly cannot have more than one meaning.

The Authority also argues that its differing substantive standards are justified by the differing degrees of deference owed to agency heads and agency bargaining representatives. It contends that its decision "rests significantly on the policy of deferring to the choices that parties make at the bargaining table," and that "applying the 'excessive-interference' test" with respect to agency-head review "would require agency

heads to 'second guess' the bargaining parties' choices." Respondent's Br. 22; *see NTEU I*, 65 F.L.R.A. at 514; *EPA*, 65 F.L.R.A. at 118. In this context, however, we see little reason to prefer the bargaining representatives' assessment of a provision to that of the agency head. Although it may be true that the agency's bargaining representatives are better positioned to understand the meaning of a particular provision and why it was included in an agreement, *see NTEU I*, 65 F.L.R.A. at 514, and while Congress may well have intended to preclude agency heads from second-guessing the legitimate concessions made during negotiations, *see AFGE II*, 778 F.2d at 858 & n.12, agency heads seem equally capable of assessing a given provision's consistency with section 7106, and section 7114(c) expressly commits such legal questions to the agency head. Indeed, the legislative history suggests that Congress enacted section 7114(c) in part due to the agency head's privileged high-level view of the agency's obligations, and that its concern over "second-guessing" was unrelated to legal questions of the sort involved in this review. *See id.* In any event, whatever the validity of the Authority's policy rationale, it has failed to justify its atextual construction of section 7106(b)(3). As we have said: "The agency's policy preferences cannot trump the words of the statute." *National Treasury Employees Union v. Chertoff*, 452 F.3d 839, 865 (D.C. Cir. 2006).

In sum, when an agency asserts that a contract provision falls outside section 7106(b)(3)'s exception to section 7106(a), whether the question concerns the agency's duty to bargain, *see* 5 U.S.C. § 7117(c), or the provision's consistency with law, *see id.* §§ 7114(c), 7122(a)(1), the underlying legal issue is precisely the same: does the provision represent an "appropriate arrangement[]"? In applying two different standards in these contexts, the Authority has set forth two inconsistent interpretations of the

very same statutory term, and thus acted arbitrarily and capriciously.

Because we must therefore vacate the Authority's decision, and because the Authority has given no indication that it plans to abandon its "excessive interference" test, we have no need to address Treasury's alternative contention that the "abrogation" standard, even if applied in all cases, represents an impermissible construction of section 7106(b)(3)'s "appropriate arrangements" language. Nor need we decide, as Treasury urges, whether the particular sick leave provision at issue here was necessarily an inappropriate arrangement under the "excessive interference" test. Instead, consistent with our usual practice, we will permit the Authority to address those contentions in the first instance. *E.g.*, *AFGE I*, 702 F.2d at 1188. We therefore grant Treasury's petition, vacate the underlying decision, and remand for further proceedings consistent with this opinion.

*So ordered.*